**[ORAL ARGUMENT REQUESTED]**

**No. 18-1453**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

———————————

DANA ALIX ZZYYM,

Plaintiff-Appellee,

v.

MICHAEL R. POMPEO,
in his official capacity as Secretary of State, and

STEVEN J. MULLEN,
in his official capacity as Director of the Colorado Passport Agency
of the United States Department of State,

Defendants-Appellants.

———————————

On Appeal from the United States District Court for the District of Colorado
District Court Case No. 15-cv-2362 (Judge R. Brooke Jackson)

———————————

**BRIEF FOR APPELLANTS**

———————————

JOSEPH H. HUNT
  *Assistant Attorney General*

JASON R. DUNN
  *United States Attorney*

HASHIM M. MOOPPAN
  *Deputy Assistant Attorney General*

BRINTON LUCAS
  *Counsel to the Assistant Attorney General*

MARK B. STERN
LEWIS S. YELIN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7239*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3425*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................iii

STATEMENT OF RELATED CASES ................................................................................v

GLOSSARY ...........................................................................................................................v

INTRODUCTION ................................................................................................................1

STATEMENT OF JURISDICTION .................................................................................2

STATEMENT OF THE ISSUE..........................................................................................2

PERTINENT STATUTE, EXECUTIVE ORDER, AND REGULATIONS............2

STATEMENT OF THE CASE............................................................................................2

      A.      Statutory and Regulatory Background............................................................2

      B.      Factual Background..........................................................................................5

      C.      Prior Proceedings............................................................................................6

SUMMARY OF ARGUMENT.......................................................................................... 15

STANDARD OF REVIEW ............................................................................................... 16

ARGUMENT ....................................................................................................................... 17

      I.      The State Department's Policy Ensures Passport Integrity .................... 18

      II.      The State Department's Policy Ensures Reliable Data for Other Agencies................................................................................................................ 23

      III.      Modifying the State Department's Policy Would Create Significant Costs...................................................................................................................... 25

CONCLUSION ................................................................................................................... 30

REQUEST FOR ORAL ARGUMENT

ADDENDUM

APPENDIX TO THE BRIEF

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF DIGITAL SUBMISSION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Copar Pumice Co. v. Tidwell,*
603 F.3d 780 (10th Cir. 2010) ........................................................................22

*Haig v. Agee,*
453 U.S. 280 (1981) ....................................................................................... 2, 3

*Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs,*
702 F.3d 1156 (10th Cir. 2012) ................................................................ 19, 26

*Holder v. Humanitarian Law Project,*
561 U.S. 1 (2010) .............................................................................................17

*Market Synergy Grp., Inc. v. DOL,*
885 F.3d 676 (10th Cir. 2018) .........................................................................17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ...........................................................................................17

*Muwekma Ohlone Tribe v. Salazar,*
708 F.3d 209 (D.C. Cir. 2013) .........................................................................21

*Public Lands Council v. Babbitt,*
167 F.3d 1287 (10th Cir. 1999) .......................................................................29

*Ron Peterson Firearms, LLC v. Jones,*
760 F.3d 1147 (10th Cir. 2014) .......................................................................17

*Urtetiqui v. D'Arcy,*
34 U.S. (9 Pet.) 692 (1835) ...............................................................................2

*Wyoming v. USDA,*
661 F.3d 1209 (10th Cir. 2011) .......................................................................16

*Zemel v. Rusk,*
381 U.S. 1 (1965) ...............................................................................................3

*Zivotofsky v. Kerry*,
   135 S. Ct. 2076 (2015) ................................................................. 2, 3

**Statutes**

5 U.S.C. § 706(2)(A) .........................................................................16

22 U.S.C. § 211a ................................................................................3

28 U.S.C. § 1291 ................................................................................2

28 U.S.C. § 1331 ................................................................................2

**Executive Order**

31 Fed. Reg. 10,603 (Aug. 9, 1966) ..................................................3

**Regulations**

22 C.F.R. §§ 51.1-51.74.....................................................................3

22 C.F.R. § 51.23(b) ..........................................................................7

22 C.F.R. §§ 51.60-51.62..................................................................23

22 C.F.R. § 51.60

   (b)(1), (2), (5)...............................................................................8

   (e)................................................................................................23

**Rules**

Fed. R. App. P. 4(a)(1)(B).................................................................2

iv

**STATEMENT OF RELATED CASES**

Counsel for appellants are not aware of any prior or related appeals.

**GLOSSARY**

APA        Administrative Procedure Act

ICAO      International Civil Aviation Organization

WPATH   World Professional Association for Transgender Health

## INTRODUCTION

For decades, the United States, like the vast majority of other countries around the world, has required its passports to identify a bearer's sex as either male or female. Among other things, this policy assists the State Department in ensuring the integrity of passport data, which in turn aids other agencies, particularly law-enforcement agencies, that rely upon such information.

The district court nevertheless dismissed this longstanding and common policy as arbitrary and capricious and ordered the Department to alter the content of its diplomatic communications by providing plaintiff with a passport containing a third sex designation. In taking this extraordinary step, the court did not conclude that the Department's various reasons for maintaining this policy were unreasonable on their face. Nor did it dispute that this order would subject the Department to the dilemma of undertaking a multimillion-dollar, two-year overhaul of its information systems or creating a unique passport that could harm U.S. foreign policy and national security. Instead, the court simply dismissed the Department's rationales as undermined by non-existent contradictions. But that is precisely the type of second-guessing that a court is ill-equipped to undertake in any arbitrary-and-capricious review, much less in an area involving sensitive considerations of foreign affairs and national security. At bottom, the district court had no basis for displacing the State Department's judgment about the appropriate content of a passport with its own.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331. The district court entered final judgment on September 19, 2018. Br. App'x 33. The government filed a notice of appeal on November 19, 2018 (App'x 217), which is timely under Federal Rule of Appellate Procedure 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether the State Department's longstanding requirement that a passport identify the bearer's sex as either male or female is arbitrary and capricious.

## PERTINENT STATUTE, EXECUTIVE ORDER, AND REGULATIONS

The relevant statute, executive order, and regulations are printed in an addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

**1.** A passport serves both as a travel document and a diplomatic "letter of introduction in which the issuing sovereign vouches for the bearer and requests other sovereigns to aid the bearer." *Haig v. Agee*, 453 U.S. 280, 292 (1981). Accordingly, as the Supreme Court has long recognized, "a passport 'from its nature and object, is addressed to foreign powers' and 'is to be considered … in the character of a political document.'" *Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2095 (2015) (alternation in original) (quoting *Urtetiqui v. D'Arcy*, 34 U.S. (9 Pet.) 692, 699 (1835)).

Given the President's "unique role in communicating with foreign governments," *Zivotofsky*, 135 S. Ct. at 2090, Congress has given the Executive Branch broad authority to regulate the contents of passports and the conditions for issuing them. *Zemel v. Rusk*, 381 U.S. 1, 12 (1965). In 1926, Congress enacted the Passport Act to "centralize passport authority in the Federal Government." *Agee*, 453 U.S. at 294. Recognizing that the passport authority is "necessarily incident to" the State Department's "general authority to conduct the foreign affairs of the United States under the Chief Executive," Congress adopted "broad and permissive" language concerning the Executive's regulation of passports. *Id.* at 294, 295. Specifically, the Passport Act provides that "[t]he Secretary of State may grant and issue passports … under such rules as the President shall designate and prescribe for and on behalf of the United States." 22 U.S.C. § 211a. The President delegated this authority to prescribe rules for the issuance of passports to the Secretary of State, 31 Fed. Reg. 10,603 (Aug. 9, 1966), who in turn promulgated detailed regulations governing passports and their content, *see* 22 C.F.R. §§ 51.1-51.74.

**2.** While early U.S. passports indicated their bearer's sex by using masculine and feminine pronouns and the word "wife," the Executive Branch did not require a specific sex designation on passports until the 1970s. AR 87.[1] The change was prompted by a

---

[1] The Administrative Record appears in the district court record at Docket Number 64.

3

recommendation from the International Civil Aviation Organization (ICAO) (AR 87-88), which "sets standards for the format of machine-readable travel documents," https://go.usa.gov/xEP3Y. The ICAO advocated a specific sex designation because, in light of the increase in international air travel and the rise of unisex attire and hairstyles, names and photographs alone were becoming less reliable indicators of a traveler's sex. AR 87-88. Consistent with that recommendation, the State Department has required all passports to designate their bearer's sex as either male or female since 1976. App'x 42-43.

In 2010, the State Department, relying on the recommendations of the World Professional Association for Transgender Health (WPATH), adopted a new policy for certain applicants who seek a passport with a sex designation that differs from the one listed on the government identification document submitted as part of the passport application. *See* App'x 88-96; AR 89. Under this new transgender policy, an applicant who has undergone gender transition and seeks a passport with a new sex designation must provide "a signed original certification or statement … from a licensed physician who has treated the applicant for his/her gender-related care or reviewed and evaluated the gender-related medical history of the applicant." App'x 90. Similarly, when an intersex individual—*i.e.*, someone "born with reproductive or sexual anatomy and/or chromosomal pattern that does not fit typical definitions of male or female"—submits a passport application indicating a sex different from the one reflected on the relevant

government identification document, the applicant must provide a medical certification attesting to the applicant's "intersex condition and specify[ing] the gender correction to either male or female." App'x 94.

## B.  Factual Background

In 2014, Zzyym, a U.S. citizen, applied for a passport.  App'x 23 (Compl. ¶ 34). Instead of checking the box next to "M" or "F" in the field asking for the applicant's sex, Zzyym wrote "intersex."  App'x 51.  Along with the application, Zzyym submitted (1) a Colorado driver's license listing Zzyym's sex as female (App'x 56); (2) a letter stating that Zzyym is intersex and requesting a passport with a sex designation of "X" (App'x 53); (3) another letter from a doctor at the Department of Veterans Affairs stating that Zzyym is intersex (App'x 59); and (4) a Michigan birth certificate amended in 2013 to indicate Zzyym's sex as "unknown" (App'x 54).

The State Department passport agency responded that "X" is not an available sex designation under Department policy.  App'x 67.  The agency informed Zzyym, however, that it could issue a passport with a female sex designation, consistent with the driver's license submitted with the application.  *Id.*  Alternatively, the letter explained, Zzyym could apply for a passport with a male sex designation by submitting the required medical certification.  App'x 67-68.

Zzyym sought reconsideration (App'x 69-70), and provided letters from two physicians (App'x 71, 73).  One stated that Zzyym "has had the appropriate clinical

treatment for transition to intersex" (App'x 71), and the other that Zzyym "was born intersex," "has had surgery for transition to female genitalia," and that "it appears that her treatment for transition has been appropriate." App'x 73.

The passport agency subsequently issued a final decision denying Zzyym's passport application. App'x 76. The agency again pointed to the State Department's requirement that a passport indicate the bearer's sex as either male or female, and explained that Zzyym's application was denied because Zzyym had indicated that Zzyym did not want a passport unless it contained a sex designation of "X." *Id.*

## C.    Prior Proceedings

**1**. Zzyym brought suit under the Administrative Procedure Act (APA), alleging, as relevant here, that the State Department's denial of Zzyym's passport application was arbitrary and capricious and also exceeded the Department's authority. App'x 16 (Compl. ¶ 2). The Department moved for judgment on the record with respect to Zzyym's administrative claims. Dkt. No. 35. In support of its motion, the Department submitted a declaration from Bennett S. Fellows, a Division Chief in the State Department's Passport Services Directorate, setting forth a number of rationales underlying the Department's sex-designation policy. App'x 41-50 (Fellows Decl.). Key among them was the importance of the male or female sex designation for data integrity purposes—specifically, the designation is used to verify a passport applicant's identity and eligibility, and provides useful passport data to other government agencies,

including law-enforcement agencies, after the passport is issued. App'x 43, 45-48 (Fellows Decl. ¶¶ 5, 13, 15, 16).

The district court denied the State Department's motion, concluding that "the administrative record contains no evidence that the Department followed a rational decisionmaking process in deciding to implement its binary-only gender passport policy." Br. App'x 6. It remanded the case to give the Department "an opportunity either to shore up the record, if it can, or reconsider its policy." Br. App'x 6-7.

**2.** On remand, the State Department reevaluated its sex-designation policy and decided to maintain it. In a May 2017 memorandum, the Department provided three categories of rationales for that decision: (1) the protection of the integrity of the passport as an identity document, (2) the utility of its data for law-enforcement and other purposes; and (3) the cost and effort that would be required to modify the State Department's information systems and those of other agencies to incorporate a third sex designation. App'x 83-87.

First, the Department explained that its policy "is necessary to ensure that the information contained in U.S. passports is accurate and verifiable, and thus to ensure the integrity of the U.S. passport as proof of identity and citizenship." App'x 84. The Department does not verify an applicant's sex by conducting a physical examination, but instead relies on third-party identification documents such as original birth certificates, driver's licenses, and identity cards. *Id.*; *see* 22 C.F.R. § 51.23(b) ("The

applicant must establish his or her identity by the submission of a previous passport, other state, local, or federal government officially issued identification with photograph, or other identifying evidence which may include an affidavit of an identifying witness."). At the time of Zzyym's passport application, all government jurisdictions issuing documents the Department uses for identity verification designated the bearer's sex as either male or female. App'x 84. The Department accordingly designates a bearer's sex as only male or female, because "[i]ssuing passports bearing a sex that is not supported by underlying evidence of identity would compromise the Department's ability to ensure the accuracy and verifiability of the information in U.S. passports." *Id.*

In addition, this sex-designation policy helps ensure that passports are issued only to those who are eligible. App'x 85. Department regulations specify classes of individuals who are not entitled to passports, including those "subject to outstanding felony arrest warrants, criminal court orders prohibiting them from leaving the country, or requests for extradition." *Id.*; *see* 22 C.F.R. § 51.60(b)(1), (2), (5). In determining that a passport application should be denied for these or other reasons, the Department relies on the databases of other federal agencies and from federal and state law enforcement authorities. App'x 85. "Sex is one of the primary data points used by these agencies in recordkeeping" and those databases "recognize only two sexes." *Id.* Requiring an applicant to designate the applicant's sex as either male or female,

consistent with the applicant's government-issued identification, "ensures accurate matches with the information contained within these databases." *Id.*

The Department also explained why its longstanding sex-designation policy is consistent with its more recent policy allowing certain transgender applicants to obtain passports designating a sex different from that on their government-issued identification documents. App'x 86-87. Under that separate policy, the Department does not issue passports based solely on an individual's gender identity, but instead allows an applicant who has undergone gender transition and provides a medical certification, which must comply with accepted medical standards concerning gender transition, to designate the sex associated with the completed transition. *Id.*

As the Department explained, that there is no comparable medical "consensus o[n] what it means, biologically, for an individual to have a sex other than male or female." App'x 87. Instead, "there are number of genetic, hormonal and physiological conditions in which an individual is not easily classified as male or female (often referred to as disorders of sexual development, or DSDs)." *Id.* And these "DSDs are highly distinct from one another," both with respect to their "biological cause" as well as "their presentation (*i.e.*, whether the individual appears to be, and/or identifies as, male, female or neither)." *Id.* Accordingly, "there is no single, biological set of traits" captured by the term "intersex." *Id.* Nor is there "a common medical understanding" as to "what treatment, if any, would be 'appropriate' for transition" to a sex other than male or

female on which the Department could "rely for purposes of documenting" a passport applicant's identity. *Id.* Given this medical uncertainty, a third sex designation would be an "unreliable … component of identity" and consequently undermine the integrity of U.S. passports as an identity document. App'x 86.

Second, including only male or female sex-designations in passport data enhances the Department's ability to assist other federal and state agencies in carrying out their functions. App'x 85. Adding a third sex designation to passports would "introduce verification difficulties in name checks and complicate automated data sharing among these other agencies," because "most if not all … have designed their own systems to accommodate only two sexes." *Id.* The ability of other agencies to access passport information for identification purposes is "particularly important" in the law-enforcement context, as law-enforcement agencies consult U.S. passport data to "identify[] crime victims and individuals in custody" and "to track[] or locat[e] persons of interest," among other reasons. *Id.* Because those agencies' databases use only male and female sex designations, adding a third sex designation to passports "could compromise law enforcement efforts to match, and thus identify, track, locate, contact, or arrest suspected or convicted criminals." App'x 86.

Third, the Department explained that altering its systems "to permit the issuance of passports with a third sex option would be expensive and time-consuming." App'x 87. To fully integrate a third sex designation into the Department's passport systems

would require substantial modification to "numerous systems within the Passport Directorate," and to "other systems within the Bureau of Consular Affairs, including systems used by overseas posts." *Id.* Other agencies that rely on passport data, such as Customs and Border Protection, would likewise have to modify their information systems "to assure continued interoperability." *Id.* Accordingly, "the time and cost" to fully integrate a third sex designation into the passport data system "is anticipated to be considerable." *Id.*

**3.** Because the State Department decided to retain its sex-designation policy, it denied Zzyym's passport application. App'x 81-82. After reopening the case, the district court again held that the Department's sex-designation policy was arbitrary and capricious. Br. App'x 32.

The district court concluded that the Department's passport-integrity rationale was "undermined" by its transgender policy, which, in the court's view, "ma[kes] it apparent that [the Department] did not actually rely on other jurisdictions' gender data to verify passport applicants' identities to the extent it argued." Br. App'x 22; *see* App'x 88-96. The court then rejected the Department's explanation that there is no medical consensus concerning intersex status. Br. App'x 25. According to the district court, the standards that provide the basis for the Department's transgender policy also "recognize[] a third sex." *Id.* (citing App'x 99-216 (WPATH, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* (7th ed.) (*Standards*))).

In addition, the district court observed, not all law-enforcement databases designate an individual's sex, so "gender is just one of many fields used to crosscheck a passport applicant/holder's identity with other systems." Br. App'x 23. The court further found that four jurisdictions had recently begun to issue identification cards with a third gender option, which it believed "cuts against" the Department's sex-designation policy. *Id.*

Finally, the district court held that the State Department could not invoke considerations of the time and expense required to fully integrate a third sex designation into its databases because the Department had not developed a precise estimate of the time needed and likely cost of that undertaking. Br. App'x 27. Despite acknowledging that "common sense would tell anyone that altering a system will necessar[il]y involve some effort and money," the court dismissed the Department's conclusion as "the product of guesswork rather than actual analysis," and thus not based on "reliable evidence." *Id.* The court therefore concluded that the Department's reliance on this consideration was irrational and that its denial of Zzyym's passport application was arbitrary and capricious. *Id.*

Based solely on its arbitrary-and-capricious ruling, the district court further held that the State Department necessarily acted in excess of its statutory authority, reasoning that "neither the Passport Act nor any other law authorizes the denial of a passport application without good reason." Br. App'x 29-30. The court then enjoined the

Department from relying on its sex-designation policy in adjudicating Zzyym's passport application. Br. App'x 32.

**4**. The State Department filed a motion for a stay pending appeal along with two declarations. The Declaration of Kenneth J. Reynolds, the Director of the Office of Consular Systems and Technology, addressed the changes to Department information systems required to incorporate a third sex designation. App'x 228-29 (Reynolds Decl. ¶¶ 11-15). Reynolds estimated that such a change would cost approximately $11 million and take about twenty-four months to implement. App'x 229. (Reynolds Decl. ¶ 15). He also noted that the Department could create a "one off" passport for Zzyym containing an 'X' sex designation, but that such a passport would not be integrated into the Department's information systems. App'x 227. (Reynolds Decl. ¶ 8).

The Declaration of Carl C. Risch, the Assistant Secretary of State for Consular Affairs, addressed the Executive Branch's "strong foreign policy interest in controlling the content of its diplomatic communications with foreign states, including the diplomatic communication represented by a U.S. Passport." App'x 220 (Risch Decl. ¶ 3). As Assistant Secretary Risch explained, issuing even a single passport that does not confirm to the Department's publicized standards—such as one listing the bearer's sex as "X"—would undermine the reliability of U.S. passports as travel documents, because other countries could come to doubt the reliability of the Department's process for issuing passports. App'x 222 (Risch Decl. ¶ 10). This could in turn lead to

"increased scrutiny" of "U.S. passports and U.S. travelers generally" and "cause disruption, inconvenience, and delay." *Id.*

In addition, Risch observed, issuing nonconforming passports could pose a threat to national security. App'x 222-23 (Risch Decl. ¶¶ 11-12). The United States depends on other countries to adhere to reliable passport standards of their own "to protect against the use of fraudulent and altered passports" by those who seek to travel to our country "for a malicious purpose." App'x 223 (Risch Decl. ¶ 11). Maintaining reliable standards for U.S. passports helps the United States "secure commitments from other countries to be similarly transparent about their own passport standards and abide by those standards." *Id.* "[D]eviating from our own standards" would therefore "undermine our ability to insist that other countries abide by theirs" and consequently deprive the government of "an important tool to protect the United States against fraud, illegal entry, and terrorism." *Id.* Moreover, if foreign officials were willing to accept a unique U.S. passport, they could be "more inclined to accept, or less able to refuse, similarly nonconforming passports issued by other countries in the future," thereby "undermin[ing] the reliability of the system of international travel" and "creating a security vulnerability for those countries" as well as our own, "as bad actors who are able to enter a foreign country may be able to exploit that access as the first step in an effort to travel to, or otherwise harm, the United States." *Id.* (Risch Decl. ¶ 12).

The district court denied the stay motion, explaining that the Department could comply with its injunction by providing Zzyym with a "one-off" passport that does not comply with the Department's publicized standards. Br. App'x 41. While the court acknowledged the national-security harms identified by Assistant Secretary Risch as "reasonable and almost self-evident," it speculated that those injuries could be mitigated by publicizing the court-ordered sex designation. *Id.* And if the Department determined that this proposed solution would not sufficiently mitigate the harm, the court reasoned, then the Department could restructure its information systems. The court recognized that this could put the Department to "a difficult choice," but believed that it was "not an impossible" one. *Id.*

The government then sought a stay of the preliminary injunction from this Court. Doc. 10110132686. As of the filing of this brief, the government is awaiting a ruling on its stay motion.

## SUMMARY OF ARGUMENT

The State Department's requirement that passport applicants designate their sex as either male or female easily withstands arbitrary-and-capricious review, especially given the deference due to the Executive's judgments in this area of foreign policy and national security. The Department explained that this sex-designation policy helps verify the identity and confirm the eligibility of passport applicants, as well as facilitate the use of passport data by a wide swath of federal and state agencies. It also observed

that adding a third sex designation to its information systems would require significant expenditures in both time and money, and that the only alternative—the creation of an individualized passport with such a designation—would harm U.S. foreign policy and national security.

Collectively and independently, these reasons are more than adequate to establish the rationality of the sex-designation policy, and the district court erred in concluding otherwise. At bottom, the court concluded that the policy was arbitrary and capricious because it was insufficiently tailored to achieving the Department's indisputably reasonable objectives. But the APA does not demand that agencies satisfy strict scrutiny, and even the supposed inconsistencies identified by the district court wilt away upon closer inspection. The Department provided eminently reasonable justifications for adhering to its longstanding practice of limiting the sex designations on a passport to male or female. The APA asks no more.

## STANDARD OF REVIEW

"Under the APA, [this Court] review[s] the district court's decision de novo, but [the Court] will not overturn the agency's action unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Wyoming v. USDA*, 661 F.3d 1209, 1226-27 (10th Cir. 2011) (citation omitted) (quoting 5 U.S.C. § 706(2)(A)).

# ARGUMENT

In dismissing the longstanding and common policy of requiring passports to designate the bearer's sex as either male or female as irrational, the district court exceeded its authority under the APA. Arbitrary-and-capricious review under the APA is "narrow," and "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see* 5 U.S.C. § 706(2)(A); *Ron Peterson Firearms, LLC v. Jones*, 760 F.3d 1147, 1161 (10th Cir. 2014) (review under the APA is "very deferential to the agency"). The key inquiry is whether it was reasonable for the agency to act for the justifications it gave, even if another decision was possible. *See Market Synergy Grp., Inc. v. DOL*, 885 F.3d 676, 683 (10th Cir. 2018). Such limited review is particularly appropriate here, given that in litigation involving "sensitive and weighty interests of national security and foreign affairs," the "evaluation of the facts by the Executive," and the policy the Executive adopts based on those facts, "is entitled to deference." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010).

Yet rather than conduct a deferential examination of the State Department's reasoning, the district court subjected it to exacting scrutiny. While accepting the legitimacy of the Department's various administrative, diplomatic, and national-security interests, the court, based on misguided reasoning, concluded that the sex-designation policy was insufficiently tailored to advance those interests. But arbitrary-and-

capricious review is not strict scrutiny, and even the alleged inconsistencies the court identified can be readily explained.

## I.    The State Department's Policy Ensures Passport Integrity

As the State Department explained, its sex-designation policy ensures that U.S. passports and their underlying data remain reliable in multiple respects.  App'x 84-87.

**A.**  To start, the policy assists the Department in verifying the identity of passport applicants.  As it explained, the Department does not verify the sex of applicants by conducting physical examinations, but by relying on third-party identification documents such as original birth certificates, driver's licenses, and identity cards.  App'x 84.  And at the time of Zzyym's passport application, every jurisdiction that issues these documents used only male and female sex designations.  *Id.*  Similarly, the Department observed, there is no "medical consensus" as to "what it means, biologically, for an individual to have a sex other than male or female," rendering a third sex designation an "unreliable … component of identity."  App'x 86-87.  Allowing applicants to select a third sex designation would therefore impede the Department in verifying the applicant's identity and consequently "undermine the integrity of the U.S. passport as an identity document."  App'x 84.

The district court never explained why the Department's sex-designation policy does not help it verify an applicant's identity and accordingly ensure that passport data

is accurate and verifiable. Instead, it simply pointed to information that allegedly "undermined" this rationale. Br. App'x 22. The APA demands more.

**1.** The district court observed that under the Department's transgender policy, Zzyym could obtain a passport with a male sex designation if Zzyym provided the necessary medical certification, even though Zzyym's driver's license had a female sex designation. Br. App'x 22. But this limited exception in no way calls into question whether the Department "actually rel[ies] on other jurisdictions' gender data to verify passport applicants' identities" in most cases (*id.*), which is the only relevant question under arbitrary-and-capricious review. *See Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1178 (10th Cir. 2012) (under arbitrary-and-capricious review, an agency's "chosen methodology is entitled to deference" if the agency provides a reasonable explanation for it). Nor does it undermine the Department's concerns about the lack of a medical consensus concerning what it means as a biological matter "for an individual to have a sex other than male or female." App'x 87.

Indeed, the Department explained that this absence of consensus underscored why it had declined to adopt a third sex designation. App'x 86-87. In light of a "medical consensus" concerning gender transition, the Department permits certain transgender applicants to obtain a passport with a sex designation of male or female that reflects their gender transition, even if that designation does not match the one on their

identification documents. App'x 86. But there is no comparable medical "consensus o[n] what it means, biologically, for an individual to have a sex other than male or female." App'x 87. In contrast to the designations of male and female, "there is no single, biological set of traits" captured by the term "intersex," but instead a range of "genetic, hormonal and physiological conditions" that are "highly distinct from one another, both as to their biological cause and as to their presentation (*i.e.*, whether the individual appears to be, and/or identifies as, male, female or neither)." *Id.* Given this uncertainty and variability, the Department concluded that a third sex designation would be an "unreliable … component of identity," and declined to adopt the additional exception the district court desired. App'x 86.

Put differently, the Department's transgender policy permits all applicants who undergo gender transition to obtain a sex designation reflecting that transition, even if it does not match the one on their identification documents, so long as they (1) provide the necessary medical certification and (2) designate their sex as either male or female. App'x 95. Thus, an intersex person who completes gender transition and lists a sex of male or female may be permitted a passport consistent with that designation. *Cf.* App'x 19 (Compl. ¶ 13) ("As with any other person, an intersex person eventually may identify as female, male or, less commonly but with some regularity, as both or neither."). The Department treats intersex individuals who decline to identify as either male or female differently from intersex individuals who have transitioned to one of those two sexes

due to the lack of a medical consensus as to "what it would mean to" undergo gender transition to "a sex other than male or female." App'x 86-87. That rational distinction is all that is required. *See Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 216 (D.C. Cir. 2013) (agency does not act arbitrarily or capriciously in treating two groups differently if the agency "point[s] to a relevant distinction between the two cases").

The district court nevertheless dismissed this explanation because it believed that WPATH's *Standards*, which provide the basis for the Department's transgender policy, "recognizes a third sex." Br. App'x 25. But although the *Standards* recognize the existence of individuals who do not identify as male or female (App'x 111), as well as intersex individuals (App'x 171), they do not identify any objective or medical consensus definition of a "third sex" that could be reliably applied by the Department as an accurate indicator of a bearer's identity (App'x 87).

**2.** Similarly, the district court discounted the Department's reliance on the sex-designation policy to ensure the integrity of passport data because sex "is just one of many fields used to crosscheck" an individual's identity. Br. App'x 23. But the same can be said of *any* particular identifying feature. That a sex designation is helpful—and not indispensable—in identifying an individual does not make the State Department's concern about the accuracy of a passport's description of that characteristic *irrational*. Likewise, the fact that "in some systems the gender field isn't even used or reliable" hardly renders the Department's sex-designation policy an arbitrary rule. *Id.*

The district court committed the same error in concluding—based on "new" evidence outside the administrative record, including a representation by Zzyym's counsel at oral argument—that the sex-designation policy is arbitrary and capricious because "at least" four jurisdictions recently began to offer a third sex designation on identity cards. Br. App'x 23. That a handful of jurisdictions may no longer use only two sex designations does not render the Department's sex-designation policy irrational. In addition, "review of agency action generally focuses on the administrative record in existence at the time of the agency's decision," *Copar Pumice Co. v. Tidwell*, 603 F.3d 780, 791 n.3 (10th Cir. 2010) (quotation marks omitted), and, at the time of the Department's decision, no jurisdiction offered a third sex designation, as the Department's 2017 memorandum explained (App'x 84).

**B.** In addition to helping verify an applicant's identity, the sex-designation policy also assists the Department in confirming an applicant's eligibility for a passport. As the Department explained, the sex of a passport applicant is a "vital data point" that assists it in reliably using data from other agencies to identify passport applicants whose applications may be denied for a variety of important reasons. App'x 85. The Department may deny a passport application, for example, if the applicant is "subject to outstanding felony arrest warrants, criminal court orders prohibiting them from leaving the country, or requests for extradition" (*id.*), or is "a minor who has been

abducted, wrongfully removed or retained in violation of a court order or decree." 22

C.F.R. § 51.60(e). *See generally id.* §§ 51.60-51.62.

To determine whether an applicant meets any of these criteria, the State

Department relies on data from other government agencies such as the Department of

Health and Human Services, the Department of the Treasury, the Social Security

Administration, and state and federal law-enforcement authorities. App'x 85. "Sex is

one of the primary data points used by these agencies," all of whose databases use only

male and female sex designations. *Id.* The sex-designation policy thus assists the State

Department in making accurate eligibility determinations. *Id.* The district court

nevertheless disregarded that explanation and provided no basis for deeming it

irrational.

## II.    The State Department's Policy Ensures Reliable Data for Other Agencies

Even after an applicant has obtained a passport, the sex-designation policy

continues to play an important role in enabling the Department to assist other federal

and state agencies in carrying out their functions. App'x 85-86. As the Department

explained, U.S. passports are "widely accepted" as "proof of identity and citizenship for

state and local governments and a wide variety of other public and private institutions."

App'x 85. Other agencies therefore depend on passport data in contexts ranging from

"issuing birth records, driver's licenses, identification cards, and vehicle registrations"

to "application and registration for employment, government benefits, education, medical treatment, financial services, and many others." *Id.*

Given that "most if not all" of these various agencies "have designed their own systems to accommodate only two sexes," creating a third sex designation for passports would "introduce verification difficulties in name checks and complicate automated data sharing among these other agencies," as well as "cause operational complications" that could "impair[] adjudication of social security benefits, immigration decisions, and other government functions." App'x 85. Such problems would be particularly severe with respect to law-enforcement agencies, who rely on passport data "for a wide range of purposes, from identifying crime victims and individuals in custody, to tracking or locating persons of interest" when they apply for a passport or use one to enter the United States. *Id.* Our country's law-enforcement and criminal-justice computer systems rely on an individual's sex, among other biodata, to match "travelers, passport applicants, and law enforcement database records," and these systems "use only male or female" sex designations. *Id.* Adding a third sex designation to the Department's passport information systems could therefore "compromise law enforcement efforts to match, and thus identify, track, locate, contact, or arrest suspected or convicted criminals." App'x 86.

Again, the district court failed to explain why these concerns were irrational. That is unsurprising given that its principal basis for deeming the Department's sex-

designation policy irrational—the alleged inconsistency between that policy and the Department's transgender policy, *see supra* p. 11—does not apply in this context even on its own terms. Adding a third sex designation to passports poses a distinct problem that is not implicated by the Department's transgender policy: Whether or not a third sex designation matches the bearer's underlying identification document, it will cause matching issues for the myriad agencies who use only male or female sex fields in their databases. The district court, however, simply lumped the Department's interest in helping other agencies carry out their functions with its need to preserve the integrity of passport data, and failed to address the important distinctions between each of the Department's various rationales. *See* Br. App'x 22-25.

## III. Modifying the State Department's Policy Would Create Significant Costs

The Department also observed that adding a third sex designation for passports would require the expenditure of "considerable" time and money. App'x 87. Accomplishing this change would require altering "numerous" information systems within the State Department alone, "including systems used by overseas posts." *Id.* The systems of other federal agencies that rely on passport data, such as Customs and Border Protection, would need to be altered as well to ensure proper data sharing. *Id.* Such updates would need to be "carefully coordinated" in order to avoid data mismatches that could "cause problems for U.S. citizens attempting to enter" the

country, and the "degree of coordination" necessary "to assure continuing operations" alone would demand significant "time and cost." *Id.*

The district court never questioned the legitimacy of the Department's interest in avoiding such burdens. To the contrary, it acknowledged that "common sense" confirms that "altering a system will necessar[il]y involve some effort and money." Br. App'x 27. The court nevertheless faulted the Department for failing to provide a precise estimate of these burdens. *Id.* But the Department explained in detail the various systems that would need to be modified as well as the significant interagency coordination required to accomplish such a change. App'x 86. The fact that the Department did not initially quantify these obvious costs—which it later estimated at $11 million and twenty-four months, App'x 229 (Reynolds Decl. ¶ 15)—did not render this consideration irrational. *Cf. Hillsdale*, 702 F.3d at 1176 (agency's "conclusion that [the] impact was unlikely to be significant, and its decision not to quantify this impact, was not arbitrary and capricious"). *See generally* App'x 225-30 (Reynolds Decl.) (providing a detailed explanation of the burdens of adding a third sex designation).

The district court also suggested that the Department could avoid these burdens simply by issuing Zzyym a "one-off" passport with a third sex designation. Br. App'x 40. But whether the injunction here requires the issuance of a unique passport that does not conform to Department standards or the wholesale revision of the standards

themselves, it cannot be justified under the APA. In any event, while a "one-off" passport might require less time and money, it exacts its own toll.

To start, as Assistant Secretary Risch explained, issuing Zzyym a "one-off" passport would impair important foreign-policy interests—namely, the Executive's interests in controlling the content of its diplomatic communications with foreign states and ensuring the reliability of its passports. App'x 220, 222 (Risch Decl. ¶¶ 3, 10). Issuing a unique passport that failed to comply with Department's standards could "undermine the confidence that other countries rightfully have" in U.S. passports and result in "increased scrutiny to U.S. passports and U.S. travelers generally." App'x 222 (Risch Decl. ¶ 10). The district court never addressed the injury to those sovereign interests.

In addition, Assistant Secretary Risch observed that issuing a "one-off" passport would create a national-security risk by "undermin[ing] our ability to insist that other countries" abide by their own passport standards, which "protect the United States against fraud, illegal entry, and terrorism." App'x 223 (Risch Decl. ¶ 11). And even those countries that are willing to accept a unique U.S. passport will become "less able to refuse[] similarly nonconforming passports issued by other countries in the future," thereby "creating a security vulnerability" that threatens the national security of those countries well as our own, as "bad actors who are able to enter a foreign country may

be able to exploit that access as the first step in an effort to travel to, or otherwise harm, the United States." *Id.* (Risch Decl. ¶ 12).

Even the district court acknowledged that these national-security concerns were "reasonable and almost self-evident" and that in any event it could "not substitute [its] views for the conclusion of a senior Department official" in this area. Br. App'x 41. It nevertheless speculated that the Department could mitigate these risks simply by publicizing its issuance of a nonstandard passport to Zzyym. *Id.* But that proposal misses the point: The national-security harm here follows not simply from a lack of publicity regarding the issuance of a nonstandard passport, but from issuing any passports that fail to conform to the Department's publicized standards. App'x 223 (Risch Decl. ¶ 11). Indeed, publicizing the passport would likely only heighten concerns to national security because doing so would make it *more* apparent to foreign countries that the United States does not abide by its own passport standards.

Perhaps recognizing these problems, the district court reasoned that if its proposed solution would fail to mitigate the risks to national security, then the Department could instead modify its entire passport system. Br. App'x 41. The court therefore put the Department to the following choice: either issue Zzyym a nonconforming passport and create the national-security risks Assistant Secretary Risch identified, or expend substantial, unrecoverable time and money to modify the Department's passport systems. But this dilemma only underscores why maintaining

the sex-designation policy is not arbitrary and capricious: The Department had good reason to avoid a policy shift that would impose significant burdens or jeopardize national security.

\* \* \*

Far from being arbitrary and capricious, the Department's retention of its longstanding sex-designation policy was a wholly rational decision supported by several independent justifications, and the district court's conclusion to the contrary withers under scrutiny. Reversing the district court's arbitrary-and-capricious holding also disposes of its ruling that the Department had exceeded its statutory authority because "neither the Passport Act nor any other law authorizes the denial of a passport application without good reason." Br. App'x 29-30. In addition to conflating two separate inquiries—whether the Department has the authority to require passports to designate the bearer's sex, and whether it exercised that authority in a rational manner— the court's statutory-authority holding is entirely parasitic on its arbitrary-and-capricious ruling and therefore fails for the same reasons. *See Public Lands Council v. Babbitt*, 167 F.3d 1287, 1293 (10th Cir. 1999) ("[T]he essential function of judicial review [under the APA] is a determination of (1) whether the agency acted within the scope of its authority, (2) whether the agency complied with prescribed procedures, and (3) whether the action *is otherwise* arbitrary, capricious or an abuse of discretion.") (first alternation in original; emphasis added).

# CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

JOSEPH H. HUNT
*Assistant Attorney General*

JASON R. DUNN
*United States Attorney*

HASHIM M. MOOPPAN
*Deputy Assistant Attorney General*

BRINTON LUCAS
*Counsel to Assistant Attorney General*

MARK B. STERN
s/ *Lewis S. Yelin*
LEWIS S. YELIN
*Attorneys, Appellate Staff*
*Civil Division, Room 7239*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3425*

March 2019

## REQUEST FOR ORAL ARGUMENT

Appellants believe that oral argument would be of assistance to this Court and respectfully request oral argument.

# ADDENDUM

22 U.S.C. § 211a................................................................Add. 1

Exec. Order No. 11295 (Aug. 5, 1966) ....................................Add. 1

21 C.F.R. pt. 51 (2017)........................................................Add. 3



Section 200, act June 30, 1906, ch. 3934, §8, 34 Stat. 816, related to bond of marshal.

## § 201. Omitted

### CODIFICATION

Section, acts Feb. 27, 1925, ch. 364, title I, 43 Stat. 1025; Apr. 29, 1926, ch. 195, title I, 44 Stat. 341; Feb. 24, 1927, ch. 189, title I, 44 Stat. 1192; Feb. 15, 1928, ch. 57, title I, 45 Stat. 76, related to expenses of judge and district attorney at sessions other than in Shanghai. By the Treaty of Jan. 11, 1943, 57 Stat., pt. 2, 767, between the United States and the Republic of China, the United States relinquished all of its extraterritorial rights in China.

## § 202. Repealed. June 25, 1948, ch. 646, § 39, 62 Stat. 992, eff. Sept. 1, 1948

Section, act June 30, 1906, ch. 3934, §9, 34 Stat. 816, related to fees of marshal and clerk.

## CHAPTER 4—PASSPORTS

| Sec. | |
|---|---|
| 211. | Repealed. |
| 211a. | Authority to grant, issue, and verify passports. |
| 212. | Persons entitled to passport. |
| 212a. | Restriction of passports for sex tourism. |
| 212b. | Unique passport identifiers for covered sex offenders. |
| 213. | Application for passport; verification by oath of initial passport. |
| 214. | Fees for execution and issuance of passports; persons excused from payment. |
| 214a. | Fees erroneously charged and paid; refund. |
| 215 to 217. | Omitted or Repealed. |
| 217a. | Validity of passport; limitation of time. |
| 218. | Returns as to passports issued, etc. |
| 219 to 229. | Repealed. |

## § 211. Repealed. July 3, 1926, ch. 772, § 4, 44 Stat. 887

Section, R.S. §4075; act June 14, 1902, ch. 1088, §1, 32 Stat. 386, provided for issuance of passports. See section 211a of this title.

## § 211a. Authority to grant, issue, and verify passports

The Secretary of State may grant and issue passports, and cause passports to be granted, issued, and verified in foreign countries by diplomatic and consular officers of the United States, and by such other employees of the Department of State who are citizens of the United States as the Secretary of State may designate, and by the chief or other executive officer of the insular possessions of the United States, under such rules as the President shall designate and prescribe for and on behalf of the United States, and no other person shall grant, issue, or verify such passports. Unless authorized by law, a passport may not be designated as restricted for travel to or for use in any country other than a country with which the United States is at war, where armed hostilities are in progress, or where there is imminent danger to the public health or the physical safety of United States travellers.

(July 3, 1926, ch. 772, §1, 44 Stat. 887; Pub. L. 95–426, title I, §124, Oct. 7, 1978, 92 Stat. 971; Pub. L. 103–236, title I, §127(a), Apr. 30, 1994, 108 Stat. 394; Pub. L. 103–415, §1(b), Oct. 25, 1994, 108 Stat. 4299.)

### AMENDMENTS

1994—Pub. L. 103–415, §1(b)(1), substituted "such other employees" for "such employees".

Pub. L. 103–415, §1(b)(2), which directed the amendment of this section by substituting "United States" for "United States," was executed by making the substitution after "who are citizens of the", to reflect the probable intent of Congress.

Pub. L. 103–236 substituted "by diplomatic and consular officers of the United States, and by other employees of the Department of State who are citizens of the United States," for "by diplomatic representatives of the United States, and by such consul generals, consuls, or vice consuls when in charge,".

1978—Pub. L. 95–426 inserted provision prohibiting passport restrictions except for countries with which the United States is at war, where armed hostilities are in progress or there is imminent danger to the public health or physical safety of United States travellers.

### SHORT TITLE OF 2006 AMENDMENT

Pub. L. 109–167, §1, Jan. 10, 2006, 119 Stat. 3578, provided that: "This Act [amending section 214 of this title] may be cited as the 'Passport Services Enhancement Act of 2005'."

### LIMITATIONS ON USE OF FUNDS FOR PROCUREMENT OF PAPER FOR PASSPORTS

Pub. L. 100–440, title VI, §617(b), Sept. 22, 1988, 102 Stat. 1755, provided that: "None of the funds made available by this or any other Act with respect to any fiscal year may be used to procure paper for passports granted or issued pursuant to the first section of the Act entitled 'An Act to regulate the issue and validity of passports, and for other purposes', approved July 3, 1926 (22 U.S.C. 211a), if such paper is manufactured outside of the United States or its possessions or is procured from any corporation or other entity owned or controlled by persons not citizens of the United States. This subsection shall not apply if no domestic manufacturer for passport paper exists."

Similar provisions were contained in the following prior appropriation act:

Pub. L. 100–202, §101(m) [title VI, §622(b)], Dec. 22, 1987, 101 Stat. 1329–390, 1329–428.

### PERSONS ENTITLED TO DIPLOMATIC OR OFFICIAL UNITED STATES PASSPORT

Pub. L. 95–426, title I, §125, Oct. 7, 1978, 92 Stat. 971, provided that: "It is the sense of the Congress that a diplomatic or official United States passport should be issued only to, and used only by, a person who holds a diplomatic or other official position in the United States Government or who is otherwise eligible for such a passport under conditions specifically authorized by law."

### EX. ORD. NO. 11295. RULES GOVERNING GRANTING, ISSUING, AND VERIFYING OF PASSPORTS

Ex. Ord. No. 11295, Aug. 5, 1966, 31 F.R. 10603, provided:

By virtue of the authority vested in me by Section 301 of Title 3 of the United States Code, and as President of the United States, it is ordered as follows:

SECTION 1. *Delegation of authority.* The Secretary of State is hereby designated and empowered to exercise, without the approval, ratification, or other action of the President, the authority conferred upon the President by the first section of the Act of July 3, 1926 (22 U.S.C. 211a), to designate and prescribe for and on behalf of the United States rules governing the granting, issuing, and verifying of passports.

SEC. 2. *Superseded orders.* Subject to Section 3 of this order, the following are hereby superseded:

(1) Executive Order No. 7856 of March 31, 1938, entitled "Rules Governing the Granting and Issuing of Passports in the United States."

(2) Executive Order No. 8820 of July 11, 1941, entitled "Amending the Foreign Service Regulations of the United States."

SEC. 3. *Saving provisions.* All rules and regulations contained in the Executive order provisions revoked by Section 2 of this order, and all rules and regulations issued under the authority of those provisions, which are in force at the time of the issuance of this order shall remain in full force and effect until revoked, or except as they may be hereafter amended or modified, in pursuance of the authority conferred by this order, unless sooner terminated by operation of law.

LYNDON B. JOHNSON.

## § 212. Persons entitled to passport

No passport shall be granted or issued to or verified for any other persons than those owing allegiance, whether citizens or not, to the United States.

(R.S. § 4076; June 14, 1902, ch. 1088, § 2, 32 Stat. 386.)

CODIFICATION

R.S. § 4076 derived from act May 30, 1866, ch. 102, 14 Stat. 54.

AMENDMENTS

1902—Act June 14, 1902, substituted "those owing allegiance, whether citizens or not, to the United States" for "citizens of the United States".

## § 212a. Restriction of passports for sex tourism

### (a) In general

Following any conviction of an individual for a violation of section 2423 of title 18, the Attorney General shall notify in a timely manner—

(1) the Secretary of State for appropriate action under subsection (b); and

(2) the Secretary of Homeland Security for appropriate action under the Immigration and Nationality Act [8 U.S.C. 1101 et seq.].

### (b) Authority to restrict passport

#### (1) Ineligibility for passport

##### (A) In general

The Secretary of State shall not issue a passport or passport card to an individual who is convicted of a violation of section 2423 of title 18 during the covered period if the individual used a passport or passport card or otherwise crossed an international border in committing the offense.

##### (B) Passport revocation

The Secretary of State shall revoke a passport or passport card previously issued to an individual described in subparagraph (A).

#### (2) Exceptions

##### (A) Emergency and humanitarian situations

Notwithstanding paragraph (1), the Secretary of State may issue a passport or passport card, in emergency circumstances or for humanitarian reasons, to an individual described in paragraph (1)(A).

##### (B) Limitation for return to United States

Notwithstanding paragraph (1), the Secretary of State may, prior to revocation, limit a previously issued passport or passport card only for return travel to the United States, or may issue a limited passport or passport card that only permits return travel to the United States.

### (3) Definitions

In this subsection—

(A) the term "covered period" means the period beginning on the date on which an individual is convicted of a violation of section 2423 of title 18 and ending on the later of—

(i) the date on which the individual is released from a sentence of imprisonment relating to the offense; and

(ii) the end of a period of parole or other supervised release of the covered individual relating to the offense; and

(B) the term "imprisonment" means being confined in or otherwise restricted to a jail, prison, half-way house, treatment facility, or another institution, on a full or part-time basis, pursuant to the sentence imposed as the result of a criminal conviction.

(Pub. L. 110–457, title II, § 236, Dec. 23, 2008, 122 Stat. 5082.)

REFERENCES IN TEXT

The Immigration and Nationality Act, referred to in subsec. (a)(2), is act June 27, 1952, ch. 477, 66 Stat. 163, which is classified principally to chapter 12 (§ 1101 et seq.) of Title 8, Aliens and Nationality. For complete classification of this Act to the Code, see Short Title note set out under section 1101 of Title 8 and Tables.

## § 212b. Unique passport identifiers for covered sex offenders

### (a) In general

Immediately after receiving a written determination from the Angel Watch Center that an individual is a covered sex offender, through the process developed for that purpose under section 21507 of title 34, the Secretary of State shall take appropriate action under subsection (b).

### (b) Authority to use unique passport identifiers

#### (1) In general

Except as provided under paragraph (2), the Secretary of State shall not issue a passport to a covered sex offender unless the passport contains a unique identifier, and may revoke a passport previously issued without such an identifier of a covered sex offender.

#### (2) Authority to reissue

Notwithstanding paragraph (1), the Secretary of State may reissue a passport that does not include a unique identifier if an individual described in subsection (a) reapplies for a passport and the Angel Watch Center provides a written determination, through the process developed for that purpose under section 21507 of title 34, to the Secretary of State that the individual is no longer required to register as a covered sex offender.

### (c) Defined terms

In this section—

(1) the term "covered sex offender" means an individual who—

(A) is a sex offender, as defined in section 21503(f) of title 34; and

(B) is currently required to register under the sex offender registration program of any jurisdiction;

(2) the term "unique identifier" means any visual designation affixed to a conspicuous lo-



Pt. 51

22 CFR Ch. I (4–1–17 Edition)

concerned or another person determined in accordance with guidance issued by the Department to have a legitimate interest.

(b) The primary grounds on which the Department will consider reversing a finding of loss of nationality and vacating a Certificate of Loss of Nationality are:

(1) The law under which the finding of loss was made has been held unconstitutional; or

(2) A major change in the interpretation of the law of expatriation is made as a result of a U.S. Supreme Court decision; or

(3) A major change in the interpretation of the law of expatriation is made by the Department, or is made by a court or another agency and adopted by the Department; and/or

(4) The person presents substantial new evidence, not previously considered, of involuntariness or absence of intent at the time of the expatriating act.

(c) When the Department reverses a finding of loss of nationality, the person concerned shall be considered not to have lost U.S. nationality as of the time the expatriating act was committed, and the Certificate of Loss of Nationality shall be vacated.

(d) Requesting the Department to reverse a finding of loss of nationality and vacate a Certificate of Loss of Nationality is not a prescribed "procedure for administrative appeal" for purposes of §358 of the Immigration and Nationality Act (8 U.S.C. 1501). The Department's decision in response to such a request is not a prescribed "procedure for administrative appeal" for purposes of §358 of the Immigration and Nationality Act (8 U.S.C. 1501). The issuance of a Certificate of Loss of Nationality by the Department is a "final administrative determination" and "final administrative denial" for purposes of §§358 and 360 of the Immigration and Nationality Act (8 U.S.C. 1501 and 1503), respectively.

[73 FR 41258, July 18, 2008]

# PART 51—PASSPORTS

Sec.
51.1 Definitions.

Subpart A—General

51.2 Passport issued to nationals only.
51.3 Types of passports.
51.4 Validity of passports.
51.5 Adjudication and issuance of passports.
51.6 Verification of passports and release of information from passport records.
51.7 Passport property of the U.S. Government.
51.8 Submission of currently valid passport.
51.9 Amendment of passports.
51.10 Replacement passports.

Subpart B—Application

51.20 General.
51.21 Execution of passport application.
51.22 Passport agents and passport acceptance agents.
51.23 Identity of applicant.
51.24 Affidavit of identifying witness.
51.25 Name of applicant to be used in passport.
51.26 Photographs.
51.27 Incompetents.
51.28 Minors.

Subpart C—Evidence of U.S. Citizenship or Nationality

51.40 Burden of proof.
51.41 Documentary evidence.
51.42 Persons born in the United States applying for a passport for the first time.
51.43 Persons born outside the United States applying for a passport for the first time.
51.44 Proof of resumption or retention of U.S. citizenship.
51.45 Department discretion to require evidence of U.S. citizenship or non-citizen nationality.
51.46 Return or retention of evidence of U.S. citizenship or non-citizen nationality.

Subpart D—Fees

51.50 Form of payment.
51.51 Passport fees.
51.52 Exemption from payment of passport fees.
51.53 Refunds.
51.54 Replacement passports without payment of applicable fees.
51.55 Execution fee not refundable.
51.56 Expedited passport processing.

Subpart E—Denial, Revocation, and Restriction of Passports

51.60 Denial and restriction of passports.
51.61 Denial of passports to certain convicted drug traffickers.
51.62 Revocation or limitation of passports.
51.63 Passports invalid for travel into or through restricted areas; prohibition on passports valid only for travel to Israel.

216

Add. 3

51.64 Special validation of passports for travel to restricted areas.
51.65 Notification of denial or revocation of passport.
51.66 Surrender of passport.

**Subpart F—Procedures for Review of Certain Denials and Revocations**

51.70 Request for hearing to review certain denials and revocations.
51.71 The hearing.
51.72 Transcript and record of the hearing.
51.73 Privacy of hearing.
51.74 Final decision.

AUTHORITY: 8 U.S.C. 1504; 18 U.S.C. 1621; 22 U.S.C. 211a, 212, 212b, 213, 213n (Pub. L. 106–113 Div. B, Sec. 1000(a)(7) [Div. A, Title II, Sec. 236], 113 Stat. 1536, 1501A–430); 214, 214a, 217a, 218, 2651a, 2671(d)(3), 2705, 2714, 2714a, 2721, & 3926; 26 U.S.C. 6039E; 31 U.S.C. 9701; 42 U.S.C. 652(k) [Div. B, Title V of Pub. L. 103–317, 108 Stat. 1760]; E.O. 11295, Aug. 6, 1966, FR 10603, 3 CFR, 1966–1970 Comp., p. 570; Pub. L. 114–119, 130 Stat. 15; Sec. 1 of Pub. L. 109–210, 120 Stat. 319; Sec. 2 of Pub. L. 109–167, 119 Stat. 3578; Sec. 5 of Pub. L. 109–472, 120 Stat. 3554; Pub. L. 108–447, Div. B, Title IV, Dec. 8, 2004, 118 Stat. 2809; Pub. L. 108–458, 118 Stat. 3638, 3823 (Dec. 17, 2004).

SOURCE: 72 FR 64931, Nov. 19, 2007, unless otherwise noted.

## §51.1 Definitions.

The following definitions are applicable to this part:

*Department* means the United States Department of State.

*Electronic passport* means a passport containing an electronically readable device, an electronic chip encoded with the bearer's personal information printed on the data page, a digitized version of the bearer's photograph, a unique chip number, and a digital signature to protect the integrity of the stored information.

*Minor* means an unmarried, unemancipated person under 18 years of age.

*Non-personal services contractor*, for purposes of this part, is an individual working under a non-personal services contract as defined in 48 CFR 37.101.

*Passport* means a travel document regardless of format issued under the authority of the Secretary of State attesting to the identity and nationality of the bearer.

*Passport acceptance agent* means a U.S. national designated by the Department to accept passport applications and to administer oaths and affirmations in connection with such applications.

*Passport agent* means a U.S. citizen employee of the Department of State, including consular officers, diplomatic officers and consular agents abroad, and such U.S. citizen Department of State employees or contractors as the Assistant Secretary for Consular Affairs may designate for the purpose of administering oaths and affirmations for passport applications.

*Passport application* means the application form for a United States passport, as prescribed by the Department pursuant to 22 U.S.C. 213 and all documents, photographs, and statements submitted with the form or thereafter in support of the application.

*Passport authorizing officer* means a U.S. citizen employee who is authorized by the Department to approve the issuance of passports.

*Personal services contractor*, for purposes of this part, means a contractor who is working under a personal services contract as described in 48 CFR 37.104.

*Secretary* means the Secretary of State.

*Special issuance passport* means a regular passport for which no passport fee is collected pursuant to §51.52, and a service, official or diplomatic passport as defined in §51.3.

*United States* when used in a geographical sense means the continental United States, Alaska, Hawaii, Puerto Rico, Guam, the Virgin Islands of the United States, and all other United States territories and possessions.

*U.S. citizen* means a person who acquired U.S. citizenship at birth or upon naturalization as provided by law and who has not subsequently lost such citizenship.

*U.S. national* means a U.S. citizen or a U.S. non-citizen national.

*U.S. non-citizen national* means a person on whom U.S. nationality, but not U.S. citizenship, has been conferred at birth under 8 U.S.C. 1408, or under other law or treaty, and who has not subsequently lost such non-citizen nationality.

[72 FR 64931, Nov. 19, 2007; 73 FR 5435, Jan. 30, 2008, as amended at 81 FR 67157, Sept. 30, 2016]

## Subpart A—General

### § 51.2  Passport issued to nationals only.

(a) A passport may be issued only to a U.S. national.

(b) Unless authorized by the Department, no person may bear more than one valid passport of the same type.

### § 51.3  Types of passports.

(a) *Regular passport.* A regular passport is issued to a national of the United States.

(b) *Service passport.* When authorized by the Department, a service passport may be issued to a non-personal services contractor traveling abroad to carry out duties in support of and pursuant to a contract with the U.S. government, when exceptional circumstances make a service passport necessary to enable the individual to carry out his or her contractual duties.

(c) *Official passport.* When authorized by the Department, an official passport may be issued to:

(1) An officer or employee of the U.S. government traveling abroad to carry out official duties, and family members of such persons;

(2) A U.S. government personal services contractor traveling abroad to carry out official duties on behalf of the U.S. government;

(3) A non-personal services contractor traveling abroad to carry out duties in support of and pursuant to a contract with the U.S. government when the contractor is unable to carry out such duties using a regular or service passport; or

(4) An official or employee of a state, local, tribal, or territorial government traveling abroad to carry out official duties in support of the U.S. government.

(d) *Diplomatic passport.* A diplomatic passport is issued to a Foreign Service Officer or to a person having diplomatic status or comparable status because he or she is traveling abroad to carry out diplomatic duties on behalf of the U.S. government. When authorized by the Department, spouses and family members of such persons may be issued diplomatic passports. When authorized by the Department, a diplomatic passport may be issued to a U.S.

government contractor if the contractor meets the eligibility requirements for a diplomatic passport and the diplomatic passport is necessary to complete his or her contractual duties in support of the U.S. government.

(e) *Passport card.* A passport card is issued to a national of the United States on the same basis as a regular passport. It is valid only for departure from and entry to the United States through land and sea ports of entry between the United States and Mexico, Canada, the Caribbean and Bermuda. It is not a globally interoperable international travel document.

[81 FR 67157, Sept. 30, 2016]

### § 51.4  Validity of passports.

(a) *Signature of bearer.* A passport book is valid only when signed by the bearer in the space designated for signature, or, if the bearer is unable to sign, signed by a person with legal authority to sign on his or her behalf. A passport card is valid without the signature of the bearer.

(b) *Period of validity of a regular passport and a passport card.* (1) A regular passport or passport card issued to an applicant 16 years of age or older is valid for ten years from date of issue unless the Department limits the validity period to a shorter period.

(2) A regular passport or passport card issued to an applicant under 16 years of age is valid for five years from date of issue unless the Department limits the validity period to a shorter period.

(3) A regular passport for which payment of the fee has been excused is valid for a period of five years from the date issued unless limited by the Department to a shorter period.

(c) *Period of validity of a service passport.* The period of validity of a service passport, unless limited by the Department to a shorter period, is five years from the date of issue, or so long as the bearer maintains the status pursuant to which the service passport is issued, whichever is shorter. A service passport which has not expired must be returned to the Department upon the termination of the bearer's status or at such other time as the Department may determine.

218

(d) *Period of validity of an official passport.* The period of validity of an official passport, unless limited by the Department to a shorter period, is five years from the date of issue, or so long as the bearer maintains his or her official status, whichever is shorter. An official passport which has not expired must be returned to the Department upon the termination of the bearer's official status or at such other time as the Department may determine.

(e) *Period of validity of a diplomatic passport.* The period of validity of a diplomatic passport, unless limited by the Department to a shorter period, is five years from the date of issue, or so long as the bearer maintains his or her diplomatic status, whichever is shorter. A diplomatic passport which has not expired must be returned to the Department upon the termination of the bearer's diplomatic status or at such other time as the Department may determine.

(f) *Limitation of validity.* The validity period of any passport may be limited by the Department to less than the normal validity period. The bearer of a limited passport may apply for a new passport, using the proper application and submitting the limited passport, applicable fees, photographs, and additional documentation, if required, to support the issuance of a new passport.

(g) *Invalidity.* A United States passport is invalid as soon as:

(1) The Department has sent or personally delivered a written notice to the bearer stating that the passport has been revoked; or

(2) The passport has been reported as lost or stolen to the Department, a U.S. passport agency or a diplomatic or consular post abroad and the Department has recorded the reported loss or theft; or

(3) The passport is cancelled by the Department (physically, electronically, or otherwise) upon issuance of a new passport of the same type to the bearer; or

(4) The Department has sent a written notice to the bearer that the passport has been invalidated because the Department has not received the applicable fees; or

(5) The passport has been materially changed in physical appearance or composition, or contains a damaged, defective or otherwise nonfunctioning chip, or includes unauthorized changes, obliterations, entries or photographs, or has observable wear or tear that renders it unfit for use as a travel document, and the Department either takes possession of the passport or sends a written notice to the bearer); or

(6) The bearer of a special issuance passport no longer maintains the status pursuant to which the passport was issued; or

(7) The Department has sent a written notice to the bearer, directly or through the bearer's employing agency, stating that a special issuance passport has been cancelled by the Department.

[81 FR 67158, Sept. 30, 2016]

## § 51.5 Adjudication and issuance of passports.

(a) A passport authorizing officer may adjudicate applications and authorize the issuance of passports.

(b) A passport authorizing officer will examine the passport application and all documents, photographs and statements submitted in support of the application in accordance with guidance issued by the Department.

## § 51.6 Verification of passports and release of information from passport records.

(a) *Verification.* When required by a foreign government, a consular officer abroad may verify a U.S. passport.

(b) *Release of information.* Information in passport records is subject to the provisions of the Freedom of Information Act (FOIA) and the Privacy Act. Release of this information may be requested in accordance with part 171 or part 172 of this title.

## § 51.7 Passport property of the U.S. Government.

(a) A passport at all times remains the property of the United States and must be returned to the U.S. Government upon demand.

(b) Law enforcement authorities who take possession of a passport for use in an investigation or prosecution must return the passport to the Department

219

on completion of the investigation and/or prosecution.

**§ 51.8 Submission of currently valid passport.**

(a) When applying for a new passport, an applicant must submit for cancellation any currently valid passport of the same type.

(b) If an applicant is unable to produce a passport under paragraph (a) of this section, he or she must submit a signed statement in the form prescribed by the Department setting forth the circumstances regarding the disposition of the passport.

(c) The Department may deny or limit a passport if the applicant has failed to provide a sufficient and credible explanation for lost, stolen, altered or mutilated passport(s) previously issued to the applicant, after being given a reasonable opportunity to do so.

**§ 51.9 Amendment of passports.**

Except for the convenience of the U.S. Government, no passport may be amended.

**§ 51.10 Replacement passports.**

A passport issuing office may issue a replacement passport without payment of applicable fees for the reasons specified in § 51.54.

## Subpart B—Application

**§ 51.20 General.**

(a) An application for a passport, a replacement passport, or other passport related service must be completed using the forms the Department prescribes.

(b) The passport applicant must truthfully answer all questions and must state every material matter of fact pertaining to his or her eligibility for a passport. All information and evidence submitted in connection with an application is considered part of the application. A person providing false information as part of a passport application, whether contemporaneously with the form or at any other time, is

subject to prosecution under applicable Federal criminal statutes.

[72 FR 64931, Nov. 19, 2007, as amended at 80 FR 72592, Nov. 20, 2015]

**§ 51.21 Execution of passport application.**

(a) *Application by personal appearance.* Except as provided in § 51.28, to assist in establishing identity, a minor, a person who has never been issued a passport in his or her own name, a person who has not been issued a passport for the full validity period of 10 years in his or her own name within 15 years of the date of a new application, or a person who is otherwise not eligible to apply for a passport by mail under paragraphs (b) and (c) of this section, must apply for a passport by appearing in person before a passport agent or passport acceptance agent (see § 51.22). The applicant must verify the application by oath or affirmation before the passport agent or passport acceptance agent, sign the completed application, provide photographs as prescribed by the Department, provide any other information or documents requested and pay the applicable fees prescribed in the Schedule of Fees for Consular Services (see 22 CFR 22.1).

(b) *Application by mail—persons in the United States.* (1) A person in the United States who previously has been issued a passport valid for 10 years in his or her own name may apply for a new passport by filling out, signing and mailing an application on the form prescribed by the Department if:

(i) The most recently issued previous passport was issued when the applicant was 16 years of age or older;

(ii) The application is made not more than 15 years following the issue date of the previous passport, except as provided in paragraph (e) of this section; and

(iii) The most recently issued previous passport of the same type is submitted with the new application.

(2) The applicant must also provide photographs as prescribed by the Department and pay the applicable fees prescribed in the Schedule of Fees for Consular Services (22 CFR 22.1).

(c) *Application by mail—persons abroad.* (1) A person in a foreign country where the Department has authorized a post to receive passport applications by mail who previously has been issued a passport valid for 10 years in his or her own name may apply for a new passport in that country by filling out, signing and mailing an application on the form prescribed by the Department if:

(i) The most recently issued previous passport was issued when the applicant was 16 years of age or older;

(ii) The application is made not more than 15 years following the issue date of the previous passport, except as provided in paragraph (e) of this section; and

(iii) The most recently issued previous passport of the same type is submitted with the new application.

(2) The applicant must also provide photographs as prescribed by the Department and pay the applicable fees prescribed in the Schedule of Fees for Consular Services (22 CFR 22.1).

(d) Nothing in this part shall prohibit or limit the Department from authorizing an overseas post to accept a passport application or applications from persons outside the country or outside the person's country of residence in circumstances which prevent provision of these services to the person where they are located or in other unusual circumstances as determined by the Department.

(e) A senior passport authorizing officer may authorize acceptance of an application by mail where the application is made more than 15 years following the issue date of the previous passport as appropriate and in accordance with guidance issued by the Department.

[72 FR 64931, Nov. 19, 2007; 73 FR 4078, Jan. 24, 2008]

## § 51.22 Passport agents and passport acceptance agents.

(a) *U.S. citizen employees of the Department authorized to serve as passport agents.* The following employees of the Department are authorized by virtue of their positions to serve as passport agents unless the Department in an individual case withdraws authorization:

(1) A passport authorizing officer;

(2) A consular officer, or a U.S. citizen consular agent abroad;

(3) A diplomatic officer specifically authorized by the Department to accept passport applications; and

(4) Such U.S. citizen Department of State employees and contractors as the Assistant Secretary for Consular Affairs may designate for the purpose of administering oaths and affirmations for passport applications.

(b) *Persons designated by the Department to serve as passport acceptance agents.* When designated by the Department, the following persons are authorized to serve as passport acceptance agents unless the Department in an individual case withdraws authorization:

(1) An employee of the clerk of any Federal court;

(2) An employee of the clerk of any state court of record;

(3) A postal employee at a United States post office that has been selected to accept passport applications;

(4) An employee of the Department of Defense at a military installation that has been authorized to accept passport applications;

(5) An employee of a federal agency that has been selected to accept passport applications; and

(6) Any other person specifically designated by the Department.

(c) *Qualifications of persons designated by the Department to serve as passport acceptance agents.* Before the Department will designate a person described in §51.22(b) as a passport acceptance agent, his or her employer must certify that the person:

(1) Is a U.S. citizen or a U.S. non-citizen national;

(2) Is 18 years of age or older;

(3) Is a permanent employee, excluding ad hoc, contractual, and volunteer employees; and

(4) Does not have a record of either:

(i) A Federal or State felony conviction; or

(ii) A misdemeanor conviction for crimes involving moral turpitude or breach of trust, including but not limited to embezzlement, identity theft, misappropriation, document fraud, drug offenses, or dishonesty in carrying out a responsibility involving public trust.

(d) *Training.* A passport acceptance agent described in §51.22(b) must be trained to apply procedures and practices as detailed in guidance provided by the Department. Training must be successfully completed before accepting passport applications.

(e) *Responsibilities.* The responsibilities of a passport acceptance agent described in §51.22(b) include but are not limited to the following:

(1) Certifying the identity of each applicant. Passport acceptance agents must certify that they have personally witnessed the applicant signing his or her application, and that the applicant has:

(i) Personally appeared;

(ii) Presented proper identification, as documented on the application;

(iii) Submitted photographs that are a true likeness; and

(iv) Taken the oath administered by the acceptance agent.

(2) Safeguarding passport application information under the Privacy

Act of 1974. Passport acceptance agents described in §51.22(b) must not retain copies of executed applications, nor release passport application information to anyone other than the applicant and the Department.

(3) Avoiding conflict of interest. Passport acceptance agents described in §51.22(b) must not participate in any relationship that could be perceived as a conflict of interest, including but not limited to providing commercial services related to the passport process.

(f) *Documentation.* Passport acceptance facilities within the United States must maintain a current listing of all passport acceptance agents designated under §51.22(b) working at its facility. This list must be updated at least annually and a copy provided to the officer specified by the Department at the appropriate passport issuing office.

(1) The current listing of all designated passport acceptance agents must include the passport acceptance agents':

(i) Names; and

(ii) Signatures.

(2) Any addition to or deletion from the current listing of designated passport acceptance agents is subject to prior approval by the Department.

## § 51.23   Identity of applicant.

(a) The applicant has the burden of establishing his or her identity.

(b) The applicant must establish his or her identity by the submission of a previous passport, other state, local, or federal government officially issued identification with photograph, or other identifying evidence which may include an affidavit of an identifying witness.

(c) The Department may require such additional evidence of identity as it deems necessary.

## § 51.24   Affidavit of identifying witness.

(a) An identifying witness must execute an affidavit in the form prescribed by the Department before the person who accepts the passport application.

(b) A person who has received or expects to receive a fee for his or her services in connection with executing the application or obtaining the passport may not serve as an identifying witness.

## § 51.25   Name of applicant to be used in passport.

(a) The passport shall be issued in the full name of the applicant, generally the name recorded in the evidence of nationality and identity.

(b) The applicant must explain any material discrepancies between the name on the application and the name recorded in the evidence of nationality and identity. The name provided by the applicant on the application may be used if the applicant submits the documentary evidence prescribed by the Department.

(c) A name change will be recognized for purposes of issuing a passport if the name change occurs in one of the following ways.

(1) *Court order or decree.* An applicant whose name has been changed by court order or decree must submit with his or her application a copy of the order or decree.

Acceptable types of court orders and decrees include but are not limited to:

(i) A name change order;

(ii) A divorce decree specifically declaring the return to a former name;

(2) Certificate of naturalization issued in a new name.

(3) *Marriage.* An applicant who has adopted a new name following marriage must present a copy of the marriage certificate.

(4) *Operation of state law.* An applicant must present operative government-issued legal documentation declaring the name change or issued in the new name.

(5) *Customary usage.* An applicant who has adopted a new name other than as prescribed in paragraphs (c)(1) through (4) of this section must submit evidence of public and exclusive use of the adopted name for a long period of time, in general five years, as prescribed in guidance issued by the Department. The evidence must include three or more public documents, including one government-issued identification with photograph and other acceptable public documents prescribed by the Department.

§ 51.26 **Photographs.**

The applicant must submit with his or her application photographs as prescribed by the Department that are a good likeness of and satisfactorily identify the applicant.

§ 51.27 **Incompetents.**

A legal guardian or other person with the legal capacity to act on behalf of a person declared incompetent may execute a passport application on the incompetent person's behalf.

§ 51.28 **Minors.**

(a) *Minors under age 16*—(1) *Personal appearance.* Minors under 16 years of age applying for a passport must appear in person, unless the personal appearance of the minor is specifically excused by a senior passport authorizing officer, pursuant to guidance issued by the Department. In cases where personal appearance is excused, the person(s) executing the passport application on behalf of the minor shall appear in person and verify the application by oath or affirmation before a person authorized by the Secretary to administer oaths or affirmations, unless these requirements are also excused by a senior passport authorizing officer pursuant to guidance issued by the Department.

(2) *Execution of passport application by both parents or by each legal guardian.* Except as specifically provided in this section, both parents or each of the minor's legal guardians, if any, whether applying for a passport for the first time or for a renewal, must execute the application on behalf of a minor under age 16 and provide documentary evidence of parentage or legal guardianship showing the minor's name, date and place of birth, and the names of the parent or parents or legal guardian.

(3) *Execution of passport application by one parent or legal guardian.* A passport application may be executed on behalf of a minor under age 16 by only one parent or legal guardian if such person provides:

(i) A notarized written statement or affidavit from the non-applying parent or legal guardian, if applicable, consenting to the issuance of the passport, or

(ii) Documentary evidence that such person is the sole parent or has sole custody of the minor. Such evidence includes, but is not limited to, the following:

(A) A birth certificate providing the minor's name, date and place of birth and the name of only the applying parent;

(B) A Consular Report of Birth Abroad of a Citizen of the United States of America or a Certification of Report of Birth of a United States Citizen providing the minor's name, date and place of birth and the name of only the applying parent;

(C) A copy of the death certificate for the non-applying parent or legal guardian;

(D) An adoption decree showing the name of only the applying parent;

(E) An order of a court of competent jurisdiction granting sole legal custody to the applying parent or legal guardian containing no travel restrictions inconsistent with issuance of the passport; or, specifically authorizing the applying parent or legal guardian to obtain a passport for the minor, regardless of custodial arrangements; or specifically authorizing the travel of the minor with the applying parent or legal guardian;

(F) An order of a court of competent jurisdiction terminating the parental

rights of the non-applying parent or declaring the non-applying parent or legal guardian to be incompetent.

(G) An order of a court of competent jurisdiction providing for joint legal custody or requiring the permission of both parents or the court for important decisions will be interpreted as requiring the permission of both parents or the court, as appropriate. Notwithstanding the existence of any such court order, a passport may be issued when compelling humanitarian or emergency reasons relating to the welfare of the minor exist.

(4) *Execution of passport application by a person acting in loco parentis.* (i) A person may apply in loco parentis on behalf of a minor under age 16 by submitting a notarized written statement or a notarized affidavit from both parents or each legal guardian, if any, specifically authorizing the application.

(ii) If only one parent or legal guardian provides the notarized written statement or notarized affidavit, the applicant must provide documentary evidence that an application may be made by one parent or legal guardian, consistent with § 51.28(a)(3)

(5) *Exigent or special family circumstances.* A passport may be issued when only one parent, legal guardian or person acting in loco parentis executes the application, in cases of exigent or special family circumstances.

(i) "Exigent circumstances" are defined as time-sensitive circumstances in which the inability of the minor to obtain a passport would jeopardize the health and safety or welfare of the minor or would result in the minor being separated from the rest of his or her traveling party. "Time sensitive" generally means that there is not enough time before the minor's emergency travel to obtain either the required consent of both parents/legal guardians or documentation reflecting a sole parent's/legal guardian's custody rights.

(ii) "Special family circumstances" are defined as circumstances in which the minor's family situation makes it exceptionally difficult for one or both of the parents to execute the passport application; and/or compelling humanitarian circumstances where the minor's lack of a passport would jeop-

ardize the health, safety, or welfare of the minor; or, pursuant to guidance issued by the Department, circumstances in which return of a minor to the jurisdiction of his or her home state or habitual residence is necessary to permit a court of competent jurisdiction to adjudicate or enforce a custody determination. A passport issued due to such special family circumstances may be limited for direct return to the United States in accordance with § 51.60(e).

(iii) A parent, legal guardian, or person acting in loco parentis who is applying for a passport for a minor under age 16 under this paragraph must submit a written statement with the application describing the exigent or special family circumstances he or she believes should be taken into consideration in applying an exception.

(iv) Determinations under § 51.28(a)(5) must be made by a senior passport authorizing officer pursuant to guidance issued by the Department.

(6) Nothing contained in this section shall prohibit any Department official adjudicating a passport application filed on behalf of a minor from requiring an applicant to submit other documentary evidence deemed necessary to establish the applying adult's entitlement to obtain a passport on behalf of a minor under the age of 16 in accordance with the provisions of this regulation.

(b) *Minors 16 years of age and above.* (1) A minor 16 years of age and above applying for a passport must appear in person and may execute the application for a passport on his or her own behalf unless the personal appearance of the minor is specifically excused by a senior passport authorizing officer pursuant to guidance issued by the Department, or unless, in the judgment of the person before whom the application is executed, it is not advisable for the minor to execute his or her own application. In such case, it must be executed by a parent or legal guardian of the minor, or by a person in loco parentis, unless the personal appearance of the parent, legal guardian or person in loco parentis is excused by the senior passport authorizing officer pursuant to guidance issued by the Department.

(2) The passport authorizing officer may at any time require a minor 16 years of age and above to submit the notarized consent of a parent, a legal guardian, or a person in loco parentis to the issuance of the passport.

(c) *Rules applicable to all minors*—(1) *Objections.* At any time prior to the issuance of a passport to a minor, the application may be disapproved and a passport may be denied upon receipt of a written objection from a parent or legal guardian of the minor, or from another party claiming authority to object, so long as the objecting party provides sufficient documentation of his or her custodial rights or other authority to object.

(2) An order from a court of competent jurisdiction providing for joint legal custody or requiring the permission of both parents or the court for important decisions will be interpreted as requiring the permission of both parents or the court as appropriate.

(3) The Department will consider a court of competent jurisdiction to be a U.S. state or federal court or a foreign court located in the minor's home state or place of habitual residence.

(4) The Department may require that conflicts regarding custody orders, whether domestic or foreign, be settled by the appropriate court before a passport may be issued.

(5) *Access by parents and legal guardians to passport records for minors.* Either parent or any legal guardian of a minor may upon written request obtain information regarding the application for and issuance of a passport to a minor, unless the requesting parent's parental rights have been terminated by an order of a court of competent jurisdiction, a copy of which has been provided to the Department. The Department may deny such information to a parent or legal guardian if it determines that the minor objects to disclosure and the minor is 16 years of age or older or if the Department determines that the minor is of sufficient age and maturity to invoke his or her own privacy rights.

## Subpart C—Evidence of U.S. Citizenship or Nationality

### §51.40 Burden of proof.

The applicant has the burden of proving that he or she is a U.S. citizen or non-citizen national.

### §51.41 Documentary evidence.

The applicant must provide documentary evidence that he or she is a U.S. citizen or non-citizen national.

### §51.42 Persons born in the United States applying for a passport for the first time.

(a) *Primary evidence of birth in the United States.* A person born in the United States generally must submit a birth certificate. The birth certificate must show the full name of the applicant, the applicant's place and date of birth, the full name of the parent(s), and must be signed by the official custodian of birth records, bear the seal of the issuing office, and show a filing date within one year of the date of birth.

(b) *Secondary evidence of birth in the United States.* If the applicant cannot submit a birth certificate that meets the requirement of paragraph (a) of this section, he or she must submit secondary evidence sufficient to establish to the satisfaction of the Department that he or she was born in the United States. Secondary evidence includes but is not limited to hospital birth certificates, baptismal certificates, medical and school records, certificates of circumcision, other documentary evidence created shortly after birth but generally not more than 5 years after birth, and/or affidavits of persons having personal knowledge of the facts of the birth.

### §51.43 Persons born outside the United States applying for a passport for the first time.

(a) *General.* A person born outside the United States must submit documentary evidence that he or she meets all the statutory requirements for acquisition of U.S. citizenship or non-citizen nationality under the provision of law or treaty under which the person is claiming U.S. citizenship or non-citizen nationality.

(b) *Documentary evidence.* (1) Types of documentary evidence of citizenship for a person born outside the United States include:

(i) A certificate of naturalization.

(ii) A certificate of citizenship.

(iii) A Consular Report of Birth Abroad.

(2) An applicant without one of these documents must produce supporting documents as required by the Department, showing acquisition of U.S. citizenship under the relevant provisions of law.

### § 51.44 Proof of resumption or retention of U.S. citizenship.

An applicant who claims to have resumed or retained U.S. citizenship must submit with the application a certificate of naturalization or evidence that he or she took the steps necessary to resume or retain U.S. citizenship in accordance with the applicable provision of law.

### § 51.45 Department discretion to require evidence of U.S. citizenship or non-citizen nationality.

The Department may require an applicant to provide any evidence that it deems necessary to establish that he or she is a U.S. citizen or non-citizen national, including evidence in addition to the evidence specified in 22 CFR 51.42 through 51.44.

### § 51.46 Return or retention of evidence of U.S. citizenship or non-citizen nationality.

The Department will generally return to the applicant evidence submitted in connection with an application for a passport. The Department may, however, retain evidence when it deems it necessary for anti-fraud or law enforcement or other similar purposes.

## Subpart D—Fees

### § 51.50 Form of payment.

Passport fees must be paid in U.S. currency or in other forms of payments permitted by the Department.

### § 51.51 Passport fees.

The Department collects the following passport fees in the amounts prescribed in the Schedule of Fees for Consular Services (22 CFR 22.1):

(a) An application fee, which must be paid at the time of application, except as provided in § 51.52, and is not refundable, except as provided in § 51.53.

(b) An execution fee, except as provided in § 51.52, when the applicant is required to execute the application in person before a person authorized to administer oaths for passport purposes. The execution fee is collected at the time of application and is not refundable (see § 51.55). When execution services are provided by an official of a State or local government or of the United States Postal Service (USPS), the State or local government or USPS may retain the fee if authorized to do so by the Department.

(c) A fee for expedited passport processing, if applicable (see § 51.56).

(d) A surcharge in the amount of twenty-two dollars ($22) on the filing of each application for a passport book, in the amount of twenty-two dollars ($22) on the filing of each application for a passport card for an applicant age 16 or over, and in the amount of fifteen dollars ($15) on the filing of each application for a passport card for an applicant under age 16, in order to cover the costs of meeting the increased demand for passports as a result of actions taken to comply with section 7209(b) of the Intelligence Reform and Terrorism Prevention Act of 2004, Public Law 108–458 (8 U.S.C. 1185 note). The surcharge will be recovered by the Department of State from within the passport application fee reflected in the Schedule of Fees for Consular Services.

(e) An "enhanced border security" surcharge on the filing of each application for a regular passport in an amount set administratively by the Department and published in the Schedule of Fees for Consular Services.

(f) Any other fee that the Department is authorized or required by law to charge for passport services.

(g) The foregoing fees are applicable regardless of the validity period of the passport.

[72 FR 64931, Nov. 19, 2007; 73 FR 5435, Jan. 30, 2008, as amended at 75 FR 36535, June 28, 2010]

**§51.52 Exemption from payment of passport fees.**

(a) A person who is exempt from the payment of passport fees under this section may obtain a passport book only for no charge. A passport card will not be issued for no charge to the individuals exempt from the payment of passport fees under this section.

(b) The following persons are exempt from payment of passport fees except for the passport execution fee, unless their applications are executed before a federal official, in which case they are also exempt from payment of the passport execution fee:

(1) An officer or employee of the United States traveling on official business and the members of his or her immediate family. The applicant must submit evidence of the official purpose of the travel and, if applicable, authorization for the members of his or her immediate family to accompany or reside with him or her abroad.

(2) An American seaman who requires a passport in connection with his or her duties aboard a United States flag vessel.

(3) A widow, widower, child, parent, brother or sister of a deceased member of the United States Armed Forces proceeding abroad to visit the grave of such service member or to attend a funeral or memorial service for such member.

(4) Other persons whom the Department determines should be exempt from payment of passport fees for compelling circumstances, pursuant to guidance issued by the Department; or

(5) Other categories of persons exempted by law.

[72 FR 74173, Dec. 31, 2007]

**§51.53 Refunds.**

(a) The Department will refund the passport application fee and the security surcharge to any person exempt from payment of passport fees under 22 CFR 51.52 from whom the fee was erroneously collected.

(b) The Department will refund an expedited passport processing fee if the Department fails to provide expedited passport processing as provided in 22 CFR 51.56.

(c) For procedures on refunds of $5.00 or less, see 22 CFR 22.6(b).

**§51.54 Replacement passports without payment of applicable fees.**

A passport issuing office may issue a replacement passport for the following reasons without payment of applicable fees:

(a) To correct an error or rectify a mistake of the Department;

(b) When the bearer has changed his or her name or other personal identifier listed on the data page of the passport, and applies for a replacement passport within one year of the date of the passport's original issuance.

(c) When the bearer of an emergency full fee passport issued for a limited validity period applies for a full validity passport within one year of the date of the passport's original issuance.

(d) When a passport is retained by U.S. law enforcement or judiciary for evidentiary purposes and the bearer is still eligible to have a passport.

(e) When a passport is issued to replace a passport with a failed electronic chip for the balance of the original validity period.

**§51.55 Execution fee not refundable.**

The fee for the execution of a passport application is not refundable.

**§51.56 Expedited passport processing.**

(a) Within the United States, an applicant for passport service (including issuance or replacement of a passport) may request expedited processing. The Department may decline the request.

(b) Expedited passport processing shall mean completing processing within the number of business days published on the Department's Web site, *http://www.travel.state.gov*, commencing when the application reaches a Passport Agency or, if the application is already with a Passport Agency, commencing when the request for expedited processing is approved. The processing will be considered completed when the passport is ready to be picked up by the applicant or is mailed to the applicant, or a letter of passport denial is transmitted to the applicant.

(c) A fee is charged for expedited passport processing (see 22 CFR 51.51(c)). The fee does not cover any

costs of mailing above the normal level of service regularly provided by the Department. The cost of expedited mailing must be paid by the applicant.

(d) The Department will not charge the fee for expedited passport processing if the Department's error, mistake or delay caused the need for expedited processing.

[72 FR 64931, Nov. 19, 2007, as amended at 74 FR 47727, Sept. 17, 2009; 80 FR 72592, Nov. 20, 2015]

## Subpart E—Denial, Revocation, and Restriction of Passports

### § 51.60  Denial and restriction of passports.

(a) The Department may not issue a passport, except a passport for direct return to the United States, in any case in which the Department determines or is informed by competent authority that:

(1) The applicant is in default on a loan received from the United States under 22 U.S.C. 2671(b)(2)(B) for the repatriation of the applicant and, where applicable, the applicant's spouse, minor child(ren), and/or other immediate family members, from a foreign country (see 22 U.S.C. 2671(d)); or

(2) The applicant has been certified by the Secretary of Health and Human Services as notified by a state agency under 42 U.S.C. 652(k) to be in arrears of child support in an amount determined by statute.

(3) The applicant is certified by the Secretary of the Treasury as having a seriously delinquent tax debt as described in 26 U.S.C. 7345.

(4) The applicant is a covered sex offender as defined in 22 U.S.C. 212b(c)(1), unless the passport, no matter the type, contains the conspicuous identifier placed by the Department as required by 22 U.S.C. 212b.

(b) The Department may refuse to issue a passport in any case in which the Department determines or is informed by competent authority that:

(1) The applicant is the subject of an outstanding Federal warrant of arrest for a felony, including a warrant issued under the Federal Fugitive Felon Act (18 U.S.C. 1073); or

(2) The applicant is subject to a criminal court order, condition of probation, or condition of parole, any of which forbids departure from the United States and the violation of which could result in the issuance of a Federal warrant of arrest, including a warrant issued under the Federal Fugitive Felon Act; or

(3) The applicant is subject to a U.S. court order committing him or her to a mental institution; or

(4) The applicant has been legally declared incompetent by a court of competent jurisdiction in the United States; or

(5) The applicant is the subject of a request for extradition or provisional request for extradition which has been presented to the government of a foreign country; or

(6) The applicant is the subject of a subpoena received from the United States pursuant to 28 U.S.C. 1783, in a matter involving Federal prosecution for, or grand jury investigation of, a felony; or

(7) The applicant is a minor and the passport may be denied under 22 CFR 51.28; or

(8) The applicant is subject to an order of restraint or apprehension issued by an appropriate officer of the United States Armed Forces pursuant to chapter 47 of title 10 of the United States Code; or

(9) The applicant is the subject of an outstanding state or local warrant of arrest for a felony; or

(10) The applicant is the subject of a request for extradition or provisional arrest submitted to the United States by a foreign country.

(c) The Department may refuse to issue a passport in any case in which:

(1) The applicant has not repaid a loan received from the United States under 22 U.S.C. 2670(j) for emergency medical attention, dietary supplements, and other emergency assistance, including, if applicable, assistance provided to his or her child(ren), spouse, and/or other immediate family members in a foreign country; or

(2) The applicant has not repaid a loan received from the United States under 22 U.S.C. 2671(b)(2)(B) or 22 U.S.C. 2671(b)(2)(A) for the repatriation or evacuation of the applicant and, if applicable, the applicant's child(ren), spouse, and/or other immediate family

228

Add. 15

members from a foreign country to the United States; or

(3) The applicant has previously been denied a passport under this section or 22 CFR 51.61, or the Department has revoked the applicant's passport or issued a limited passport for direct return to the United States under 22 CFR 51.62, and the applicant has not shown that there has been a change in circumstances since the denial, revocation or issuance of a limited passport that warrants issuance of a passport; or

(4) The Secretary determines that the applicant's activities abroad are causing or are likely to cause serious damage to the national security or the foreign policy of the United States.

(d) The Department may refuse to issue a passport in a case in which the Department is informed by an appropriate foreign government authority or international organization that the applicant is the subject of a warrant of arrest for a felony.

(e) The Department may refuse to issue a passport, except a passport for direct return to the United States, in any case in which the Department determines or is informed by a competent authority that the applicant is a minor who has been abducted, wrongfully removed or retained in violation of a court order or decree and return to his or her home state or habitual residence is necessary to permit a court of competent jurisdiction to determine custody matters.

(f) The Department may refuse to issue a passport to an applicant who fails to provide his or her Social Security account number on his or her passport application or who willfully, intentionally, negligently, or recklessly includes an incorrect or invalid Social Security account number.

(g) The Department shall not issue a passport card to an applicant who is a covered sex offender as defined in 22 U.S.C. 212b(c)(1).

[72 FR 64931, Nov. 19, 2007, as amended at 81 FR 60609, Sept. 1, 2016; 81 FR 66185, Sept. 27, 2016]

**§ 51.61 Denial of passports to certain convicted drug traffickers.**

(a) A passport may not be issued in any case in which the Department determines or is informed by competent authority that the applicant is subject to imprisonment or supervised release as the result of a felony conviction for a Federal or state drug offense, if the individual used a U.S. passport or otherwise crossed an international border in committing the offense, including a felony conviction arising under:

(1) The Controlled Substances Act (21 U.S.C. 801 *et seq.*) or the Controlled Substances Import and Export Act (21 U.S.C. 951 *et seq.*); or

(2) Any Federal law involving controlled substances as defined in section 802 of the Controlled Substances Act (21 U.S.C. 801 *et seq.*); or

(3) The Bank Secrecy Act (31 U.S.C. 5311 *et seq.*) or the Money Laundering Act (18 U.S.C. 1956 *et seq.*) if the Department is in receipt of information that supports the determination that the violation involved is related to illicit production of or trafficking in a controlled substance; or

(4) Any state law involving the manufacture, distribution, or possession of a controlled substance.

(b) A passport may be refused in any case in which the Department determines or is informed by competent authority that the applicant is subject to imprisonment or supervised release as the result of a misdemeanor conviction of a Federal or state drug offense if the individual used a U.S. passport or otherwise crossed an international border in committing the offense, other than a first conviction for possession of a controlled substance, including a misdemeanor conviction arising under:

(1) The Federal statutes described in § 51.61(a); or

(2) Any State law involving the manufacture, distribution, or possession of a controlled substance.

(c) Notwithstanding paragraph (a) of this section, the Department may issue a passport when the competent authority confirms, or the Department otherwise finds, that emergency circumstances or humanitarian reasons exist.

**§ 51.62 Revocation or limitation of passports.**

(a) The Department may revoke or limit a passport when

(1) The bearer of the passport may be denied a passport under 22 CFR 51.60 or

51.61; or 51.28; or any other provision contained in this part; or,

(2) The passport has been obtained illegally, fraudulently or erroneously; was created through illegality or fraud practiced upon the Department; or has been fraudulently altered or misused;

(b) The Department may revoke a passport when the Department has determined that the bearer of the passport is not a U.S. national, or the Department is on notice that the bearer's certificate of citizenship or certificate of naturalization has been canceled.

### § 51.63 Passports invalid for travel into or through restricted areas; prohibition on passports valid only for travel to Israel.

(a) The Secretary may restrict the use of a passport for travel to or use in a country or area which the Secretary has determined is:

(1) A country with which the United States is at war; or

(2) A country or area where armed hostilities are in progress; or

(3) A country or area in which there is imminent danger to the public health or physical safety of United States travelers.

(b) Any determination made and restriction imposed under paragraph (a) of this section, or any extension or revocation of the restriction, shall be published in the FEDERAL REGISTER.

(c) A passport may not be designated as valid only for travel to Israel.

### § 51.64 Special validation of passports for travel to restricted areas.

(a) A U.S. national may apply to the Department for a special validation of his or passport to permit its use for travel to, or use in, a restricted country or area. The application must be accompanied by evidence that the applicant falls within one of the categories in paragraph (c) of this section.

(b) The Department may grant a special validation if it determines that the validation is in the national interest of the United States.

(c) A special validation may be determined to be in the national interest if:

(1) The applicant is a professional reporter or journalist, the purpose of whose trip is to obtain, and make available to the public, information about the restricted area; or

(2) The applicant is a representative of the International Committee of the Red Cross or the American Red Cross traveling pursuant to an officially-sponsored Red Cross mission; or

(3) The applicant's trip is justified by compelling humanitarian considerations; or

(4) The applicant's request is otherwise in the national interest.

### § 51.65 Notification of denial or revocation of passport.

(a) The Department will notify in writing any person whose application for issuance of a passport has been denied, or whose passport has been revoked. The notification will set forth the specific reasons for the denial or revocation, and, if applicable, the procedures for review available under 22 CFR 51.70 through 51.74.

(b) An application for a passport will be denied or treated as abandoned if an applicant fails to meet his or her burden of proof under 22 CFR 51.23(a) and 51.40 or otherwise does not provide documentation sufficient to establish entitlement to passport issuance within ninety days of notification by the Department that additional information from the applicant is required. Thereafter, if an applicant wishes to pursue a claim of entitlement to passport issuance, he or she must submit a new application and supporting documents, photographs, and statements in support of the application, along with applicable application and execution fees.

### § 51.66 Surrender of passport.

The bearer of a passport that is revoked must surrender it to the Department or its authorized representative upon demand.

## Subpart F—Procedures for Review of Certain Denials and Revocations

### § 51.70 Request for hearing to review certain denials and revocations.

(a) A person whose passport has been denied or revoked under 22 CFR 51.60(b)(1) through (10), 51.60(c), 51.60(d), 51.61(b), 51.62(a)(1) where the basis for the adverse action would entitle the

230

applicant to a hearing under this section, or §51.62(a)(2) may request a hearing to the Department to review the basis for the denial or revocation within 60 days of receipt of the notice of the denial or revocation.

(b) The provisions of §§51.70 through 51.74 do not apply to any action of the Department taken on an individual basis in denying, restricting, revoking, or invalidating a passport or in any other way adversely affecting the ability of a person to receive or use a passport for reasons excluded from §51.70(a) including:

(1) Non-nationality;

(2) Refusal under the provisions of 51.60(a);

(3) Refusal to grant a discretionary exception under emergency or humanitarian relief provisions of §51.61(c);

(4) Refusal to grant a discretionary exception from geographical limitations of general applicability.

(c) If a timely request for a hearing is made, the Department will hold it within 60 days of the date the Department receives the request, unless the person requesting the hearing asks for a later date and the Department and the hearing officer agree.

(d) The Department will give the person requesting the hearing not less than 10 business days' written notice of the date and place of the hearing.

### § 51.71  The hearing.

(a) The Department will name a hearing officer, who will make findings of fact and submit recommendations based on the record of the hearing as defined in §51.72 to the Deputy Assistant Secretary for Passport Services in the Bureau of Consular Affairs.

(b) The person requesting the hearing may appear in person, or with or by his designated attorney. The attorney must be admitted to practice in any state of the United States, the District of Columbia, any territory or possession of the United States, or be admitted to practice before the courts of the country in which the hearing is to be held.

(c) The person requesting the hearing may testify, offer evidence in his or her own behalf, present witnesses, and make arguments at the hearing. The person requesting the hearing is re-

sponsible for all costs associated with the presentation of his or her case. The Department may present witnesses, offer evidence, and make arguments in its behalf. The Department is responsible for all costs associated with the presentation of its case.

(d) Formal rules of evidence will not apply, but the hearing officer may impose reasonable restrictions on relevancy, materiality, and competency of evidence presented. Testimony will be under oath or by affirmation under penalty of perjury. The hearing officer may not consider any information that is not also made available to the person requesting the hearing and made a part of the record of the proceeding.

(e) If any witness is unable to appear in person, the hearing officer may, in his or her discretion, accept an affidavit from or order a deposition of the witness, the cost for which will be the responsibility of the requesting party.

### § 51.72  Transcript and record of the hearing.

A qualified reporter will make a complete verbatim transcript of the hearing. The person requesting the hearing and/or his or her attorney may review and purchase a copy of the transcript. The hearing transcript and the documents received by the hearing officer will constitute the record of the hearing.

### § 51.73  Privacy of hearing.

Only the person requesting the hearing, his or her attorney, the hearing officer, official reporters, and employees of the Department directly concerned with the presentation of the case for the Department may be present at the hearing. Witnesses may be present only while actually giving testimony or as otherwise directed by the hearing officer.

### § 51.74  Final decision.

After reviewing the record of the hearing and the findings of fact and recommendations of the hearing officer, the Deputy Assistant Secretary for Passport Services will decide whether to uphold the denial or revocation of the passport. The Department will promptly notify the person requesting the hearing in writing of the decision.

If the decision is to uphold the denial or revocation, the notice will contain the reason(s) for the decision. The decision is final and is not subject to further administrative review.

## PART 53—PASSPORT REQUIREMENT AND EXCEPTIONS

Sec.
53.1  Passport requirement; definitions.
53.2  Exceptions.
53.3  Attempt of a citizen to enter without a valid passport.
53.4  Optional use of a valid passport.

AUTHORITY: 8 U.S.C. 1185; 8 U.S.C. 1185 note (section 7209 of Pub. L. 108–458); E.O. 13323, 69 FR 241 (Dec. 30, 2003).

SOURCE: 71 FR 68430, Nov. 24, 2006, unless otherwise noted.

### § 53.1  Passport requirement; definitions.

(a) It is unlawful for a citizen of the United States, unless excepted under 22 CFR 53.2, to enter or depart, or attempt to enter or depart, the United States, without a valid U.S. passport.

(b) For purposes of this part "United States" means "United States" as defined in section 215(c) of the Immigration and Nationality Act of 1952, as amended (8 U.S.C. 1185(c)).

### § 53.2  Exceptions.

(a) U.S. citizens, as defined in § 41.0 of this chapter, are not required to bear U.S. passports when traveling directly between parts of the United States as defined in § 51.1 of this chapter.

(b) A U.S. citizen is not required to bear a valid U.S. passport to enter or depart the United States:

(1) When traveling as a member of the Armed Forces of the United States on active duty and when he or she is in the uniform of, or bears documents identifying him or her as a member of, such Armed Forces, when under official orders or permit of such Armed Forces, and when carrying a military identification card; or

(2) When traveling entirely within the Western Hemisphere on a cruise ship, and when the U.S. citizen boards the cruise ship at a port or place within the United States and returns on the return voyage of the same cruise ship to the same United States port or place from where he or she originally departed. That U.S. citizen may present a government-issued photo identification document in combination with either an original or a copy of his or her birth certificate, a Consular Report of Birth Abroad issued by the Department, or a Certificate of Naturalization issued by U.S. Citizenship and Immigration Services before entering the United States; if the U.S. citizen is under the age of 16, he or she may present either an original or a copy of his or her birth certificate, a Consular Report of Birth Abroad issued by the Department, or a Certificate of Naturalization issued by U.S. Citizenship and Immigration Services; or

(3) When traveling as a U.S. citizen seaman, carrying an unexpired Merchant Marine Document (MMD) in conjunction with maritime business. The MMD is not sufficient to establish citizenship for purposes of issuance of a United States passport under part 51 of this chapter; or

(4) *Trusted traveler programs*—(i) *NEXUS Program.* When traveling as a participant in the NEXUS program, he or she may present a valid NEXUS program card when using a NEXUS Air kiosk or when entering the United States from contiguous territory or adjacent islands at a land or sea port-of-entry. A U.S. citizen who enters the United States by pleasure vessel from Canada under the remote inspection system may also present a NEXUS program card;

(ii) *FAST program.* A U.S. citizen who is traveling as a participant in the FAST program may present a valid FAST card when entering the United States from contiguous territory or adjacent islands at a land or sea port-of-entry;

(iii) *SENTRI program.* A U.S. citizen who is traveling as a participant in the SENTRI program may present a valid SENTRI card when entering the United States from contiguous territory or adjacent islands at a land or sea port-of-entry; The NEXUS, FAST, and SENTRI cards are not sufficient to establish citizenship for purposes of issuance of a U.S. passport under part 51 of this chapter; or

## APPENDIX TO THE BRIEF

Order, Dkt. No. 55, No. 15-2362 (Nov. 22, 2016) ..........................................Br. App'x 1

Order, Dkt. No. 88, No. 15-2362 (Sept. 19, 2018) ......................................Br. App'x 13

Final Judgment, Dkt. No. 89, No. 15-2362 (Sept. 19, 2018) ........................Br. App'x 33

Order, Dkt. No. 106, N. 15-2362 (Feb. 21, 2019)..........................................Br. App'x 35

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 15-cv-02362-RBJ

DANA ALIX ZZYYM,

      Plaintiff,

v.

JOHN FORBES KERRY, in his official capacity as the Secretary of State; and
SHERMAN PORTELL, in his official capacity as the Director of the Colorado Passport Agency
for the United States Department of State,

      Defendants.

---

## ORDER

---

    Dana Alix Zzyym is an intersex individual.[1]  ECF No. 1 at ¶1 (Complaint).  In September

2014 Dana submitted an application for a United States passport.  *Id.* at ¶34.  Instead of checking

the box labeled "M" for male or "F" for female on the application form, Dana instead wrote

"intersex" below the "sex" category.  ECF No. 34 at 2 (Administrative Record).  By separate

letter Dana informed the passport authorities that Dana was neither male nor female.  *Id.* at 4.

The letter requested "X" as an acceptable marker in the sex field to conform to International

Civil Aviation Organization ("ICAO") standards for machine-readable travel documents.  ECF

No. 1 at ¶35.

---

[1]  Plaintiff explains: "'Intersex' is an umbrella term used to describe a wide range of natural bodily variations.  Intersex people are born with sex characteristics that do not fit typical binary notions of bodies designated 'male' or 'female.'  In some cases, intersex traits are visible at birth, while in others they are not apparent until puberty.  Some variations may not be visibly apparent at all."  Complaint, ECF No. 1, at ¶11.

1

Br. App'x 1

It is undisputed that in every other respect Dana is qualified to receive a passport. However, the application was denied.  ECF No. 34 at 18.  Dana sued, contending that the State Department's denial of the application and its underlying binary-only gender policy violated the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(2)(A), as well as plaintiff's due process and equal protection rights under the Fifth Amendment of the U.S. Constitution.  *See generally* ECF No. 1.

Administrative Record

The Department issued its initial denial of Dana's passport application on September 24, 2014, explaining that "[t]he Department of State currently requires the sex field on United States passports to be listed as 'M' or 'F[,]'" and that the Department would be "unable to fulfill your request to list your sex as 'X.'"  ECF No. 34 at 18.  The Department nevertheless stated that it would issue Dana a passport listing gender as "female," which was the sex listed on the driver's license plaintiff submitted to prove Dana's identity during the application process.  *Id.* Alternatively, the Department explained that it could issue Dana a "male" passport if Dana provided "a signed original statement on office letterhead from [Dana's] attending medical physician" in which the doctor attested to Dana's "new gender."  *Id.* at 19 (referencing 7 FAM 1300 App. M "Gender Change").

Dana chose neither.  Instead, Dana submitted a letter to the Department on December 18, 2014 appealing the Department's decision.  *Id.* at 29–30.  Dana included with that appeal two sworn documents by physicians from the United States Department of Veterans Affairs Medical Center in Cheyenne, Wyoming (Dana served in the Navy) that verified Dana's sex as "intersex."[2]  *Id.* at 31–32.  Dana also met with people at the Colorado Passport Agency (part of

---

[2] Dana also included a birth certificate that had been amended in 2012 to list Dana's sex as "unknown." ECF No. 34 at 5; ECF No. 1 at ¶10.

the State Department) and informed them that Dana "did not wish a passport to be issued . . .

unless it could be issued showing the sex as 'X.'" *Id.*

The Department nevertheless denied Dana's appeal on December 29, 2014, informing

Dana that the Department could not accommodate the request for the same reasons it stated in its

initial denial letter. *Id.*; ECF No. 1 at ¶38. The Department, however, explained that Dana could

still obtain a passport by reapplying and providing all required information on the passport

application form—that is, checking either the box "M" for male or "F" for female. ECF No. 34

at 36. On February 26, 2015 Dana requested that the Department once again reconsider its

decision or conduct a review hearing under 22 C.F.R. § 51.70(a). ECF No. 1 at ¶39. The

Department denied both requests on April 10, 2015. *Id.* at ¶40.

<u>Procedural History</u>

Dana subsequently brought suit against defendants Secretary of State John Forbes Kerry

and Sherman Portell, the Director of the Colorado Passport Agency, in their official capacities on

October 25, 2015. *Id.* The Complaint asserts (1) that the Department's conduct was in violation

of the APA because it was "arbitrary and capricious;" (2) that the conduct also violated the APA

because it exceeded the Department's Congressionally-delegated authority; (3) that such action

deprived plaintiff of due process in violation of the Fifth Amendment; (4) that it similarly

deprived plaintiff of equal protection in violation of the Fifth Amendment; and (5) that the Court

should issue a writ of mandamus to compel the Department to issue a passport accurately

reflecting plaintiff's self-described sex. *Id.* at ¶¶48–95. Several months later on March 18, 2016

defendants filed a motion seeking judgment on the administrative record on plaintiff's APA

claims and dismissal of the claims contained within the remainder of plaintiff's Complaint. ECF

3

No. 35.  The Court held oral arguments on that motion on July 20, 2016.  ECF No. 51

(Transcript).  That motion is the subject of this Order.[3]

## II. STANDARD OF REVIEW

### A.  Motion for Judgment on the Administrative Record.

Under the APA, a court must "hold unlawful and set aside agency action, findings, and

conclusions" that it finds to be, among other things: (1) "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law;" or (2) "in excess of statutory jurisdiction,

authority, or limitations, or short of statutory right[.]"  5 U.S.C. § 706(2)(A), (C).  I discuss each

standard below.

### 1.  "Arbitrary or Capricious" Standard.

Typically, "[a]n agency's action is entitled to a presumption of validity, and the burden is

upon the petitioner to establish the action is arbitrary or capricious."  *Sorenson Commc'ns, Inc. v.

F.C.C.*, 567 F.3d 1215, 1221 (10th Cir. 2009).  Once agency action is challenged as arbitrary or

capricious, a district court reviews that action under the APA as if it were an appellate court.[4]

*See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994).  As part of the

appeal, the court "ascertain[s] whether the agency examined the relevant data and articulated a

rational connection between the facts found and the decision made."  *Id.* at 1574 (citing *Motor

Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983)).  That is, the court

---

[3] The parties confusingly appear to suggest that plaintiff has also filed a dispositive motion in this case.  *See, e.g.*, ECF No. 45 (Plaintiff's "Reply Brief" in Support of Declaratory, Injunctive, and Other Relief).  Defendants characterize plaintiff's Response to their dispositive motion as one that "raises a distinct motion for (summary) judgment on *all* claims." ECF No. 41 at 5 n.2 (emphasis in original).  However, plaintiff has not formally submitted a motion for summary judgment or any other dispositive motion in this case, aside from plaintiff's APA "appeal" of the Department's action discussed *infra*.

[4] As defendant explains, although in the District of Colorado a plaintiff or petitioner typically files the opening brief when "appealing" a government agency's decision under the APA, the parties have agreed "with the Court's approval, that defendants would file the first dispositive motion in this case," and that their motion would address the APA claims.  ECF No. 35 at 6 n.1.

4

"must determine whether the agency considered all relevant factors and whether there has been a clear error of judgment." *Id.*

A court will set aside agency action "if the agency relied on factors which Congress has not intended for it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (citing *State Farm*, 463 U.S. at 43) (internal quotation marks omitted). Furthermore, "[b]ecause the arbitrary and capricious standard focuses on the rationality of an agency's decisionmaking process rather than on the rationality of the actual decision, it is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id.* at 1575 (citing *State Farm*, 463 U.S. at 50) (internal quotation marks and brackets omitted).

In terms of remedies, if "a court finds that an agency has acted arbitrarily in violation of the APA . . . the appropriate remedy is to remand the issue back to the agency for reconsideration and, if appropriate, further investigation or an explanation adequate to support the agency's decision upon remand." *Mohammed v. Holder*, 47 F. Supp. 3d 1236, 1263 (D. Colo. 2014), *appeal dismissed* (Nov. 19, 2014) (citing *Fox Television Stations, Inc. v. F.C.C.*, 280 F.3d 1027, 1047 (D.C. Cir. 2002)).

**2.   "Excess of Authority" Standard.**

Plaintiff also challenges the Department's conduct under the APA as being in excess of its Congressionally-delegated authority.  "Determination of whether the agency acted within the scope of its authority requires a delineation of the scope of the agency's authority and discretion, and consideration of whether on the facts, the agency's action can reasonably be said to be

5

within that range." *Olenhouse*, 42 F.3d at 1574 (citing *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971)).

### B.  Rule 12(b)(6) Motion to Dismiss.

To survive a 12(b)(6) motion to dismiss, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A plausible claim is a claim that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the Court must accept the well-pleaded allegations of the complaint as true and construe them in the light most favorable to the plaintiff, *Robbins v. Wilkie*, 300 F.3d 1208, 1210 (10th Cir. 2002), conclusory allegations are not entitled to be presumed true, *Iqbal*, 556 U.S. at 681. However, so long as the plaintiff offers sufficient factual allegations such that the right to relief is raised above the speculative level, he has met the threshold pleading standard.  *See, e.g.*, *Twombly*, 550 U.S. at 556; *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008).

### III. ANALYSIS

Plaintiff seeks a passport marked "X" to comport with plaintiff's intersex identity.  Citing its binary-only gender policy, the government has refused.  Plaintiff contends that the government's unwillingness to adapt to the needs and desires of intersex individuals, in contrast to policies it has implemented for others such as transsexuals, is of constitutional significance. But in my view, we are not yet at the point where this Court must venture into the constitutional fray.  I find that the administrative record contains no evidence that the Department followed a rational decisionmaking process in deciding to implement its binary-only gender passport policy. Therefore, the proper next step is to remand the case to the Department to give it an opportunity

either to shore up the record, if it can, or reconsider its policy. *See Mohammed*, 47 F. Supp. 3d at 1263 (explaining that a remand is the proper remedy after a finding that an agency has acted in an "arbitrary or capricious" way).

### A.  The State Department's Binary-Only Gender "Policy."

As indicated above, because plaintiff alleges that the Department's binary-only gender policy was not the product of reasoned decisionmaking, the Court begins by examining the administrative record for evidence that the government formulated its policy in a rational manner. *Olenhouse*, 42 F.3d at 1575.  Before turning to that task, however, I note that plaintiff takes issue with the decisionmaking behind both the Department's denial of plaintiff's specific passport application, as well as its underlying binary-only gender "policy."  ECF No. 1 at ¶50. But because the Department explains its decision to deny plaintiff's individual application by reference to its underlying policy, my focus will be on whether the Department formulated its broader policy in a rational manner.

I also note that while both parties refer to this agency action as a singular Department "policy," doing so is a bit of a misnomer.  The "policy" which the Department claims requires it to issue passports only marked "M" for male or "F" for female is really a collection of rules pertaining to gender contained within the Foreign Affairs Manual ("FAM").  *See* ECF No. 34 at 20–27 (citing 7 FAM 1310 Appendix M, 7 FAM 1320 Appendix M, 7 FAM 1330 Appendix M, 7 FAM 1340 Appendix M, 7 FAM 1350 Appendix M, 7 FAM 1360 Appendix M, 7 FAM 1370 Appendix M, 7 FAM 1380 Appendix M, and 7 FAM 1390 Appendix M).  These rules do not explicitly state that the Department cannot issue a passport containing an alternative gender marking.  *See id.*  Rather, they simply explain how the Department deals with different issues related to gender on passport applications.  *Id.*  The rules collectively do not contemplate the

7

existence of a gender other than male or female.  Accordingly, the Department insists that it

cannot (or at least will not) issue passports that are only marked "M" or "F."

### B.   The Administrative Record and the Declaration of Bennet S. Fellows.

As mentioned above, the Court begins its analysis by examining the administrative

record.  Here, however, the original record provided to the Court gave no justification for why

the Department decided to institute a binary-only gender policy.  Rather, it simply justified the

Department's decision to deny Dana's application by referring to that policy.  It explained that

the Department requires applicants to check a box marked either "M" or "F" before it will issue a

passport.  Because plaintiff did not check either box, her application was denied.  End of story.

*See generally* ECF No. 34.

Perhaps recognizing this justification is no justification at all when it comes to the

government's decision to follow a binary-only gender policy, defendants supplemented the

record after litigation commenced.  They did so by generating and providing the Court with a

declaration from Bennet S. Fellows, the Division Chief of the Office of Adjudication Policy in

the Office of Adjudication of the U.S. Department of State.  ECF No. 41-1.[5]  Nevertheless, as

explained below, while this declaration gets the government somewhat closer to rationally

explaining its decision to issue passports only marked "M" or "F," it still falls short.[6]

---

[5] Plaintiff objects to the presentation of "extra-record" material.  However, the Supreme Court has
instructed that when the administrative record is devoid of a justification for a challenged informal agency
action, the court should "obtain from the agency, either through affidavits or testimony, such additional
explanation of the reasons for the agency decision as may prove necessary."  *See Camp v. Pitts*, 411 U.S.
138, 142–43 (1973) (per curiam); *Olenhouse*, 42 F.3d at 1575 ("If the agency has failed to provide a
reasoned explanation for its action, or if limitations in the administrative record make it impossible to
conclude the action was the product of reasoned decisionmaking, the reviewing court may supplement the
record or remand the case to the agency for further proceedings.").  This Court's evaluation of the reasons
provided in the declaration essentially moots the matter in any event.

[6] Mr. Fellows informs the Court that before 1976 applicants for U.S. passports were not required to
identify their sex.  However, since October 1976 all applicants must specify their sex as "M" or "F."  ECF
No. 41-1 at ¶4.  That of course begs the question, what was it that motivated the Department to change

8

First, much of Mr. Fellows' declaration consists of background information that merely describes and clarifies the government's policy.  For instance, Mr. Fellows states that sex is one of the key data such as name, date of birth, and place of birth that the Department deems material to its adjudication of the applicant's claim.  *Id.* at ¶¶5, 13.  An application without "M" or "F" checked is not considered to be complete.  *Id.* at ¶6.  Writing a word above "M" or "F" does not constitute submitting the data required by the form.  *Id.* at ¶¶6, 9.  Furthermore, the Department requires visa applicants to select one of these two sex markers.  *Id.* at ¶8.  And similarly, no other federal agency that issues citizenship documents recognizes the use of a third marker.  *Id.* at ¶15.  While this is helpful background information, none of it rationalizes the decisionmaking process behind this policy.

Next, the declaration attempts to explain the government's decision to institute its binary-only gender policy by rationalizing the policy itself.  It states that key data (again sex, name, date of birth, place of birth) "must . . . be supported by documentation generated by third parties, such as birth certificates, driver's licenses, social security cards, third-party affidavits, and/or other documentation consistent with the information submitted by the applicant," but that none of the entities issuing many of these documents "currently authorize[] the use of an "X" or any marker other than "M" and "F."  *Id.* at ¶¶5, 15.  Thus, as the reasoning goes, the government decided to issue passports only marked "M" or "F" because the proper documentation needed to prove a passport applicant's sex necessarily took that form.

But this rationale is unpersuasive for two reasons.  First, it is entirely self-fulfilling.  As Dana's passport application experience reveals, the government rejects otherwise proper identity documents (e.g. "third-party affidavits") when they support a sex other than male or female.  *See*

course in 1976?  While I searched the declaration for answers and found none, this question gets at the heart of plaintiff's APA challenge—why did the government make this change and how did it go about doing so?

ECF No. 34 at 29–36.  Thus, *substance* is what drives the government's decision about what qualifies as "proper" documentation, not necessarily form.  Furthermore, the Department does not even uniformly rely on these binary systems used by other jurisdictions to verify applicants' identities.  For example, although plaintiff previously obtained a driver's license as a female, see ECF No. 34 at 7, the Department nevertheless instructed plaintiff that it would issue a passport marked "M" for male if plaintiff simply provided a physician's letter attesting to that gender.  *Id.* at 18–19.  This is evidently the regulation the Department also follows with transgender applicants or with those whom are in the process of transitioning.  *Id.* at 19–21.

A third rationale the declaration advances is that the applicant's sex and photograph are among the data that are stored in a contactless chip embedded in the passport book, and that only the binary options "M" and "F" appear in these chips.  *Id.* at ¶¶10, 14.  To the extent that is just another recitation of the Department's current policy, it does not advance the ball.  If the implication is that a decision to permit intersex individuals to write "intersex" or "X" on their application would require reprogramming the software and hardware that produce the chips (or the production of new forms and waste of existing supplies), then that does not explain why the government first began to require passport applicants to choose either sex in 1976, see *supra* note 6, but it would at least provide a reason for the Department's reluctance to change course now. In any event, the Department hasn't yet made that argument or attempted to show why it would consider that to be worse than accommodating this presumably small population of intersex individuals.

Fourth, the declaration stresses the importance of enabling U.S. passport information to sync with law enforcement databases that exclusively use binary gender systems.  *Id.* at ¶16.  Mr. Fellows candidly acknowledges, however, that "not every law enforcement record from which

10

data is input to this system designates an individual's sex" and states that "a field left blank in the system is assumed to reflect that the particular datum is unknown or unrecorded, and not to indicate 'intersex' or other possible alternative categorization." *Id.* Nevertheless, if syncing passport information to the records contained within law enforcement databases is truly critical for the Department, then how does it rationally explain its decision to inform plaintiff that it would issue plaintiff a "male" passport knowing full well that plaintiff had state identification documents (and perhaps law enforcement database records?) listing plaintiff as "female?" *See* ECF No. 34 at 28. How does the Department sync a transgender individual's passport information with law enforcement records that might list that very same passport holder as the opposite sex? Without answers to these questions, I cannot conclude that the government rationally decided to formulate a binary-only gender policy.

Finally, Mr. Fellows explains that "because only a few countries recognize a third sex marker in their issuance of passports and visas under the precatory specification of the International Civil Aviation Organization (ICAO) . . . the Department's introduction of a third gender marker in the sex field of U.S. passports could lead to inconvenience and uncertainty if U.S. citizens face difficulty entering tourist and business destinations abroad in countries that do not yet recognize a third gender marker." *Id.* at ¶17. That raises several questions. Is this pure speculation? Is it a fact that other countries validate the information contained within a passport, as opposed to simply verifying the authenticity of the passport itself? And if a third gender marker did lead to inconvenience or difficulty entering other countries, isn't that solely the problem of the passport holder who made the choice? The current record does not explain why these factors rationally support the policy in place.

11

## CONCLUSION AND ORDER

I find that the administrative record, as supplemented by the Fellows declaration, does not show that the decisionmaking process that resulted in the policy in question was rational. That is not to say that it can't be done, but the Department's first effort to get over the arbitrary and capricious hump was not convincing.  The Court remands the matter to the Department for reconsideration.  The Court will not address the constitutional issues unless and until it needs to.

DATED this 22nd day of November, 2016.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge

12

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 15-cv-02362-RBJ

DANA ALIX ZZYYM,

      Plaintiff,

v.

MICHAEL R. POMPEO, in his official capacity as the Secretary of State; and
SHERMAN PORTELL, in his official capacity as the Director of the Colorado Passport Agency
for the United States Department of State,

      Defendants.

---

## ORDER

---

    This matter is before the Court on the U.S. Department of State's motion seeking

judgment on the administrative record on plaintiff Dana Zzyym's Administrative Procedure Act

("APA") claims and dismissal of the claims contained within the remainder of Dana's

Complaint.  ECF No. 35.  The case was administratively closed in November 2016 after I found

that the administrative record did not show that the Department's decision-making process

resulting in the gender policy was rational.  ECF Nos. 55–56.  I remanded the case to the

Department for reconsideration of its policy.  ECF No. 55.  After reconsideration, the

Department reaffirmed the gender policy in May 2017, and in June 2017 I reopened the case.

The parties filed supplemental briefing with regard to the Department's motion seeking judgment

on the administrative record and to dismiss.  ECF Nos. 58, 65, 68.

    After considering the briefings, oral argument, and relevant law, the Court determines

that (1) the Department's gender policy is arbitrary and capricious under the APA, and (2) the

1

denial of Dana's passport application is in excess of the Department's statutory authority (Counts I and II).  Because the APA grants Dana relief, the Court need not resolve the motion to dismiss on the constitutional claims or Dana's claim under the mandamus act (Counts III, IV, V).

## I. BACKGROUND

Dana Alix Zzyym is an intersex individual.[1]  ECF No. 1 at ¶1 (Complaint).  In September 2014 Dana submitted an application for a United States passport.  *Id.* at ¶34.  Instead of checking the box labeled "M" for male or "F" for female on the application form, Dana instead wrote "intersex" below the "sex" category.  ECF No. 34 at 2 (Administrative Record).  By separate letter Dana informed the passport authorities that Dana was neither male nor female.  *Id.* at 4.  The letter requested "X" as an acceptable marker in the sex field to conform to International Civil Aviation Organization ("ICAO") standards for machine-readable travel documents.  ECF No. 1 at ¶35.

It is undisputed that in every other respect Dana is qualified to receive a passport.  However, the application was denied (and has since been denied a second time).  ECF No. 34 at 18; Administrative R. [Dkt. 64-01 through 64-44] [hereinafter "R."], 79–80.  Dana sued, contending that the State Department's denials of Dana's application and its underlying binary-only gender policy violate the APA, 5 U.S.C. § 706, as well as Dana's due process and equal protection rights under the Fifth Amendment of the U.S. Constitution.  *See generally* ECF Nos. 1, 61 (Supplemental Complaint).

---

[1]  Plaintiff explains: "'Intersex' is an umbrella term used to describe a wide range of natural bodily variations.  Intersex people are born with sex characteristics that do not fit typical binary notions of bodies designated 'male' or 'female.'  In some cases, intersex traits are visible at birth, while in others they are not apparent until puberty.  Some variations may not be visibly apparent at all."  Complaint, ECF No. 1, at ¶11.

<u>Procedural History</u>

The Department issued its initial denial of Dana's passport application on September 24, 2014, explaining that "[t]he Department of State currently requires the sex field on United States passports to be listed as 'M' or 'F[,]'" and that the Department would be "unable to fulfill your request to list your sex as 'X.'"  ECF No. 34 at 18.  The Department nevertheless stated that it would issue Dana a passport listing gender as "female," which was the sex listed on the driver's license plaintiff submitted to prove Dana's identity during the application process.  *Id.* Alternatively, the Department explained that it could issue Dana a "male" passport if Dana provided "a signed original statement on office letterhead from [Dana's] attending medical physician" in which the doctor attested to Dana's "new gender."  *Id.* at 19 (referencing 7 FAM 1300 App. M "Gender Change").

Dana chose neither.  Instead, Dana submitted a letter to the Department on December 18, 2014 appealing the Department's decision.  *Id.* at 29–30.  Dana included with that appeal two sworn documents by physicians from the United States Department of Veterans Affairs Medical Center in Cheyenne, Wyoming (Dana served in the Navy) that verified Dana's sex as "intersex."[2]  *Id.* at 31–32.  Dana also met with people at the Colorado Passport Agency (part of the State Department) and informed them that Dana "did not wish a passport to be issued . . . unless it could be issued showing the sex as 'X.'"  *Id.*

The Department nevertheless denied Dana's appeal on December 29, 2014, informing Dana that the Department could not accommodate the request for the same reasons it stated in its initial denial letter.  *Id.*; ECF No. 1 at ¶38.  The Department explained that Dana could still obtain a passport by reapplying and providing all required information on the passport

---

[2] Dana also included a birth certificate that had been amended in 2012 to list Dana's sex as "unknown." ECF No. 34 at 5; ECF No. 1 at ¶10.

application form—that is, checking either the box "M" for male or "F" for female. ECF No. 34 at 36. On February 26, 2015 Dana requested that the Department once again reconsider its decision or conduct a review hearing under 22 C.F.R. § 51.70(a). ECF No. 1 at ¶39. The Department denied both requests on April 10, 2015. *Id.* at ¶40.

Dana subsequently brought suit against the Secretary of State, who is currently Michael Pompeo,[3] and Sherman Portell, the Director of the Colorado Passport Agency, in their official capacities on October 25, 2015. *Id.* The Complaint asserted (1) that the Department's conduct was in violation of the APA because it was "arbitrary and capricious;" (2) that the conduct also violated the APA because it exceeded the Department's Congressionally delegated authority; (3) that such action deprived plaintiff of due process in violation of the Fifth Amendment; (4) that it similarly deprived plaintiff of equal protection in violation of the Fifth Amendment; and (5) that the Court should issue a writ of mandamus to compel the Department to issue a passport accurately reflecting plaintiff as intersex. *Id.* at ¶¶48–95.

Several months later on March 18, 2016 defendants filed a motion seeking judgment on the administrative record on plaintiff's APA claims and dismissal of the claims contained within the remainder of plaintiff's Complaint. ECF No. 35. The Court held oral argument on that motion on July 20, 2016. ECF No. 51 (Transcript). On November 26, 2016, I ruled that the agency's decision-making process was not rational based upon the evidence in the record and remanded the case to the Department for reevaluation of its gender policy. *Zzyym v. Kerry*, 220 F. Supp. 3d 1106, 1114 (D. Colo. 2016).

In March 2017, while the Department was reevaluating the policy, Dana requested that the Department issue a full-validity or temporary passport bearing an "X" or other third-gender

---

[3] Since the date this case was filed, the Secretary of State has changed three times and therefore so has the named defendant in this case.

marking in the sex field in order for Dana to attend an international conference. R. 67–69. The

Department refused to issue the temporary passport but noted that it would soon complete its

review of the policy. R. 75–76. On May 1, 2017 the Department denied Dana's passport

application for a second time and issued a memorandum in which it explained its decision to

maintain the gender policy. R. 79–80, 82–90.

This case was reopened at Dana's unopposed request, and as such the Department's

motion seeking judgment on the administrative record on plaintiff's APA claims and dismissal of

the claims contained within the remainder of Dana's Complaint is ripe once more. ECF No. 35.

On July 6, 2017 Dana filed a supplemental complaint to reflect the May 2017 denial of Dana's

passport application. ECF No. 61. As reflected in the supplemental complaint, Dana seeks

"injunctive relief and a judicial declaration that the State Department has exceeded its authority

under the Administrative Procedure Act ("APA"), 5 U.S.C. §706(2) and has violated the Fifth

Amendment to the U.S. Constitution through agency actions which occurred after October 25,

2015." ECF No. 61 at 2.

In October 2017 Dana filed a brief regarding the Department's May 2017 decision to

maintain the policy. ECF No. 65. The Department submitted the complete Administrative

Record, ECF No. 64, and filed a response to Dana's brief. ECF No. 68. On June 29, 2018 the

Court heard oral argument regarding these briefs and the Department's decision to maintain the

policy. ECF No. 85. The case has now been fully briefed and is ripe for review.

## II. STANDARD OF REVIEW

### A.  Motion for Judgment on the Administrative Record.

Under the APA, a court must "hold unlawful and set aside agency action, findings, and

conclusions" that it finds to be, among other things: (1) "arbitrary, capricious, an abuse of

5

discretion, or otherwise not in accordance with law;" or (2) "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]"  5 U.S.C. § 706(2)(A), (C).  I discuss each standard below.

### 1.  "Arbitrary or Capricious" Standard.

Typically, "[a]n agency's action is entitled to a presumption of validity, and the burden is upon the petitioner to establish the action is arbitrary or capricious."  *Sorenson Commc'ns, Inc. v. F.C.C.*, 567 F.3d 1215, 1221 (10th Cir. 2009).  Once agency action is challenged as arbitrary or capricious, a district court reviews that action under the APA as if it were an appellate court.[4] *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994).  As part of the appeal, the court "ascertain[s] whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made."  *Id.* at 1574 (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983)).  That is, the court "must determine whether the agency considered all relevant factors and whether there has been a clear error of judgment."  *Id.*

A court will set aside agency action "if the agency relied on factors which Congress has not intended for it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id.* (citing *State Farm*, 463 U.S. at 43) (internal quotation marks omitted). Furthermore, "[b]ecause the arbitrary and capricious standard focuses on the rationality of an agency's decisionmaking process rather than on the rationality of the actual decision, it is well-

---

[4] As defendant explains, although in the District of Colorado a plaintiff or petitioner typically files the opening brief when "appealing" a government agency's decision under the APA, the parties have agreed "with the Court's approval, that defendants would file the first dispositive motion in this case," and that their motion would address the APA claims.  ECF No. 35 at 6 n.1.

6

established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id.* at 1575 (citing *State Farm*, 463 U.S. at 50) (internal quotation marks and brackets omitted).

### 2.  **"Excess of Authority" Standard.**

Plaintiff also challenges the Department's conduct under the APA as being in excess of its Congressionally delegated authority.  "Determination of whether the agency acted within the scope of its authority requires a delineation of the scope of the agency's authority and discretion, and consideration of whether on the facts, the agency's action can reasonably be said to be within that range."  *Olenhouse*, 42 F.3d at 1574 (citing *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971)).

## III. ANALYSIS

Plaintiff seeks a passport marked "X" to comport with plaintiff's intersex identity.  Citing its binary-only gender policy, the Department has refused.[5]  Plaintiff contends that the government's unwillingness to adapt to the needs of intersex individuals is arbitrary, capricious, and not the result of rational decision making.  Further, plaintiff contends that in contrast to policies it has implemented for others such as transgender individuals, the refusal to issue passports that reflect the gender of intersex people is of constitutional significance.  Because the APA disposes of the claims, I will not address the constitutional issues (Counts III and IV).

### A.  **APA Claims (Counts I and II).**

---

[5] I noted in my last order, and will note again here that the term "policy" is a bit of a misnomer.  The policy which the Department claims requires it to issue passports only marked "M" for male or "F" for female is really a collection of rules pertaining to gender contained within the Foreign Affairs Manual.  *See* ECF No. 34 at 20-27 (citing 7 FAM 1310 Appendix M, 7 FAM 1320 Appendix M, 7 FAM 1330 Appendix M, 7 FAM 1340 Appendix M, 7 FAM 1350 Appendix M, 7 FAM 1360 Appendix M, 7 FAM 1370 Appendix M, 7 FAM 1380 Appendix M, 7 FAM 1390 Appendix M).  These rules do not explicitly state that the Department cannot issue a passport containing an alternative gender marking, and also do not contemplate the existence of a gender other than male or female.  Rather, they simply explain how the Department deals with different issues related to gender on passport applications.

7

1.  **The Policy is Arbitrary and Capricious, 5 U.S.C. § 706(2)(A)).**

The APA empowers the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).  Agency action is arbitrary and capricious if it is not the product of reasoned decision making.  This means, among other things, that an agency must provide an adequate evidentiary basis for its action and consider all important aspects of the problem before it.

As background: prior to 1976, passports issued by the Department did not include gender. ECF No. 51 at 18.  However, the Department changed course and added a male and female checkbox.  The applicant is required to choose one or the other.  *Id*.  In my order dated November 22, 2016 I found that the administrative record did not show that the Department's decision-making process that resulted in the gender policy was rational.  ECF No. 55.  The reasons provided by the Department for the policy failed to show a reasoned decision-making process and instead seemed to be ad hoc rationalizations for the binary nature of the gender field. I remanded the case to the Department for reconsideration which, in effect, gave the Department an additional chance to bolster the record and show that the policy making underlying the gender policy was not arbitrary and capricious.  The Department did indeed reconsider the policy, and it submitted an eight-page memorandum explaining its rationale and pointing to the evidence it relied upon in making its decision to deny Dana's application once more.  R. 82–90.

Now, for me to find that the Department's policy making was not arbitrary and capricious, the May 2017 memorandum must display something more than what was before me in November 2016 that explains how and why the policy was created.  In the Department's memorandum, the Department first notes that it is aware that some countries and the

8

International Civil Aviation Organization (the UN agency that sets forth passport specifications)

provide for the issuance of travel documents bearing an "X" in addition to "M" or "F".  R. 82.

The Department then provides five reasons for the gender policy:

1. **Sex Data Point Ensures Accuracy and Verifiability of Passport Holder's Identity**: The policy is necessary to ensure that the information contained in US passports is accurate and verifiable, thus ensuring the integrity of the US passport as proof of identity and citizenship.  Because the Department relies on third-party documentation issued by state, municipal, and/or foreign authorities who largely do not allow gender identifiers other than male or female to determine an applicant's identity, the Department would have a more difficult job verifying the identity of a passport holder if a gender aside from male or female was used.

2. **Sex Data Point is Used to Determine Applicant's Eligibility to Receive Passport**: The policy is necessary because the sex of a passport applicant (male or female) is a vital data point in determining whether someone is entitled to a passport.  In order to determine whether an applicant is eligible to receive a passport, the Department must data-match with other law enforcement systems.  Because "all such agencies recognize only two sexes," the Department's continued use of a binary option for the sex data point is the most reliable means to determine eligibility.

3. **Consistency of Sex Data Point Ensures Easy Verification of Passport Holder's Identity in Domestic Contexts**: The policy is necessary to ensure that a passport can be used as a reliable proof of identity within the United States.  The introduction of a "new, third sex option in US passport applications and Passport data systems could introduce verification difficulties in name checks and complicate automated data sharing among these other agencies."  The Department believes that this would "cause operational complications."

4. **There is No Generally Accepted Medical Consensus on How to Define a Third Sex**: The policy is necessary because there is no generally accepted medical consensus as to how to define a third sex, making it unreliable as a component of identity verification.  "Although the Department acknowledges that there are individuals whose gender identity is neither male nor female, the Department lacks a sound basis on which to make a reliable determination that such an individual has changed their sex to match that gender identity."

5. **Altering Department System Would Be Expensive and Time-Consuming**: The policy is necessary because changing it would be inconvenient.

Looking at the proffered reasons and cited evidence provided by the Department, I find that the

Department's decision is arbitrary and capricious.  I will address each of the Department's

9

proffered reasons and explain why in my judgment they do not show that the gender policy is the product of a rational decision-making process.

*i. Reasons One through Three Fail to Show Rational Decision Making*

Reasons one through three essentially boil down to the same argument—*the Department needs to maintain the binary gender classification system for passports because this will ensure accuracy and reliability in cross-checking gender data with other identity systems*. R. 82–86. The Department notes that the binary system is important at two points: (1) when determining if an applicant is eligible to receive a passport, and (2) when a passport holder seeks to use their passport as proof of identity. *Id.* After reviewing the memorandum and administrative record, I find that the Department failed to add any substantive arguments or evidence that wasn't previously before the Court when I rejected this argument in my November 2016 Order.

In that order, I noted that the Department's argument that the binary gender policy helped to ensure the accurate identification of passport applicants/holders failed when one looked deeper at the evidence in the administrative record. For example, I noted that the Department undermined its purported rationale when it informed Dana that Dana could receive a male passport if Dana provided a physician's letter attesting to that gender, even though Dana's Colorado driver's license listed Dana's gender as female. ECF No 55 at 10. The Department has established policies in place that passport specialists and consular officers must follow "when an applicant indicates a gender on the 'sex' line on the passport application with information different from some or all of the submitted citizenship and/or identity evidence[,]" R. 178; 7 FAM § 1310 App. M. By allowing this means of gender designation on the passport, the Department made it apparent that it did not actually rely on other jurisdictions' gender data to verify passport applicants' identities to the extent it argued.

10

Further, I noted that the administrative record included evidence that "not every law enforcement record from which data is input to this system designates an individual's sex," and "a field left blank in the system is assumed to reflect that the particular datum is unknown or unrecorded." ECF No. 55 at 10 (citing declaration of Bennet Fellows, Division Chief at the Department). Therefore—in addition to the Department's admission that gender is just one of many fields used to crosscheck a passport applicant/holder's identity with other systems (other fields include one's social security number, date of birth, name, etc.)—the Department also admitted that in some systems the gender field isn't even used or reliable. As such, I held the Department's insistence that a binary gender data option is necessary to ensure accuracy and reliability simply was not the case under the evidence provided and therefore was insufficient to show that the policy was the product of rational decision making.

Since that decision, the only "new" evidence in the record on this point cuts against the Department. Joining multiple countries and the International Civil Aviation Organization's recognition of a non-binary gender classification system, at least four U.S. states and territories now issue identification cards with a third gender option.[6] The Department was on notice of this when it reconsidered its policy.[7] As such, the Department's insistence that a binary gender system is necessary to accurately and reliably crosscheck a passport applicant/holder's identity ignores the reality that some American passport applicants will have gender verification documents that exclusively list a gender that is neither female nor male.

---

[6] These U.S. states are Washington, Oregon, California, and the District of Columbia. Further, at oral argument in June 2018, Dana represented that New York issued a birth certificate stating "intersex" in the sex field. *See* ECF No. 85 at 7.

[7] *See* R. 189 (Department's acknowledgment that other jurisdictions considering non-binary gender policy).

As support to its May 2017 letter, the Department offers a "History of the Designation of Sex in U.S. Passports," to explain the basis for its 1976 decision to add a requirement that applicant's designate either "male" or "female" in passport applications.  R. 87–90.  This brief history explained that the decision to add a sex marker to passport applications was made under the direction of the International Civil Aviation Organization (ICAO), which commissioned a panel of passport experts to address border security concerns resulting from the increase in international air travel.  Apparently, the data field of "SEX (M-F)" was recommended because experts thought "[that with] the rise in the early 1970s of unisex attire and hairstyles, photographs had become a less reliable means for ascertaining a traveler's sex."  R. 88.  In a 1974 report "an ICAO panel confirmed that a holder's sex should be included on passports because names did not always provide a ready indication, and appearances from the passport photograph could be misleading."  *Id*.  Though this still doesn't answer the question of why a traveler's sex needed to be ascertained, the Department notes that at the time there was no consideration of a third sex marker as the passport book was based on the technical specifications of the ICAO, and the ICAO specified only male and female.  *Id.*

But as noted already, the ICAO standards for machine-readable travel documents now specify that sex should be designated by "the capital F for female, M for male, or X for unspecified." ECF 1 ¶ 35; ICAO Document 9303, Machine Readable Travel Documents, at IV-14 (7th ed. 2015) at 14.  The Department does not explain its departure from adherence to this standard.

Overall, in these three rationales, the Department argues that the purpose of the sex designation on the passport is to ensure the accuracy and integrity of the document.  The Department has maintained that the male and female markers "help identify the bearer of the

document, and ensure that the passport remains reliable proof of identification." ECF 35 at 24.

Dana submitted multiple medical certifications from licensed physicians attesting that she is

neither male nor female, but intersex. Dana's Complaint describes invasive and unnecessary

medical procedures that doctors subjected Dana to as a child that attempted but failed to change

Dana's intersex nature. ECF 1 ¶ 15. I find that requiring an intersex person to misrepresent their

sex on this identity document is a perplexing way to serve the Department's goal of accuracy and

integrity. In sum, taking the Department's proffered rationales that I previously determined were

inadequate with the new evidence in the administrative record regarding the growing body of

jurisdictions that allow for a non-binary gender marker, I find that the Department failed to show

that its decision-making process regarding the policy was rationale.

### ii. Reason Four Fails to Show Rational Decision Making

The Department's fourth asserted reason for maintaining the binary gender policy also

fails. The Department argues that the policy is necessary because there is no generally accepted

medical consensus as to how to define a third sex, making it unreliable as a component of

identity. R. 85. However, by its own regulations, the Department relies upon a medical

authority which plainly recognizes a third sex. *See* 7 FAM §1310(b). The Department defers to

the medical "standards and recommendations for the World Professional Association for

Transgender Health (WPATH), recognized as the authority in this field by the American Medical

Association (AMA)," 7 FAM §1310(b) App. M. WPATH recognizes a third sex. R. 646–763.

In addition, the administrative record includes the opinions of three former U.S. Surgeons

General and the American Medical Association Board of Trustees that describe non-binary sex

categories. ECF No. 65 at 13–14. The Department recognizes that it is medically established

that an intersex person is born with mixed or ambiguous markers of sex that do not fit into the

typical notions of either male or female bodies. 7 FAM §1360 App. M; R. 185, 605, 765.  The

Department's uncertainty about how it would evaluate persons "transitioning" to a third sex

misses the ball – intersex people are born as they are.

In the May 2017 letter, the Department highlights that it is unable to recognize a third

gender "partly due to the lack of consensus of what it means, biologically, for an individual to

have a sex other than male or female."  R 86.  However, the information relied upon in the

administrative record also reflect a lack of consensus as to how individuals born intersex could

be classified as either "male" or "female," R. 947–65. [8]  This has not prevented the Department

from requiring intersex people to elect, perhaps at random, as it doesn't seem to matter to the

Department which one of those two categories Dana chooses.  Even if the Court ignored the

Department's deference to the WPATH, the justification that there is a lack of medical

consensus, whereby "there are a number of genetic, hormonal and physiological conditions in

which an individual is not easily classified as male or female," R. 86, still fails to account for

why the binary sex designation is preferable.

Taking this evidence together, the Department's argument that the gender policy is

necessary because there is no medically accepted consensus regarding a third sex is not rational

and fails.

---

[8] Moreover, Plaintiff offers evidence of the potential harmful effects of forcing an arbitrary binary classification upon people born intersex.  ECF. 65 at 14.  Re-Thinking Genital Surgeries on Intersex Infants, Elders, Satcher and Carmona (October 26, 2016), at http://www.palmcenter.org/wp-content/uploads/2017/06/Re-Thinking-Genital-Surgeries-1.pdf ("[A] consensus is emerging that concludes that children born with atypical genitalia should not have genitoplasty absent a need to ensure physical functioning.").  Dana's Complaint reflects that attempts to sort intersex individuals into the categories of "male" or "female" upon birth have resulted in unnecessary and painful medical surgeries and harm to intersex individuals.

### iii. Reason Five is not Sufficient

Finally, the Department arrives at what this Court suspects is the real reason that the Department has been so resistant to adding a third gender option to passports: money and time. The Department argues that switching the existing data systems—which are currently incapable of printing a passport that reflects a gender option other than "M" or "F"—would be considerably costly and timely.  R. 86.  However, the Department admits that it has not undertaken a level of effort (LOE) estimation on the time and cost that it would take to add the third sex designation option to the U.S. passport biodata page.  *Id.*  This does not ring of a rational decision.  Without record evidence of or even an attempt at determining the time, cost, or coordination necessary, the Court cannot defer to the Department's claims of administrative convenience.  *See, e.g.*, *Plyer v. Doe*, 457 U.S. 202, 227–28 (1982) ("There is no evidence in the record suggesting . . . any significant burden on the State's economy.").  True, common sense would tell anyone that altering a system will necessary involve some effort and money. However, the Department's rational here is the product of guesswork rather than actual analysis, and it does not rise to the level of reliable evidence that is needed to show that the Department's policymaking was rational.

In sum, the Department added very little to the evidence and explanations that were before this Court in November 2016 when I determined that the Department's policymaking was not the product of rational decision making.  Even with the new memorandum and proffered reasons, I again find that the gender policy is arbitrary and capricious and not the product of rational decision making.

**2. The Denial of Dana's Passport Application Exceeds the Authority Delegated to the Department by Congress, 5 U.S.C. § 706(2)(C)).**

Dana challenges the policy under a second provision of the APA, section 706(2)(C), which empowers the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Dana argues that the Department is acting beyond its authority in denying the option for a non-binary gender option on the passport application. ECF No. 1 at 14–15.

The Department has the power to issue passports under the Passport Act of 1926 "under such rules as the President shall designate and prescribe for and on behalf of the United States." 22 U.S.C. § 211a; *see* Exec. Order 11295. While this grant of authority does not expressly authorize the denial of passport applications nor specify particular reasons that passports may be denied, the Supreme Court has construed this power broadly. Defendant and plaintiff refer to the Supreme Court cases of *Kent v. Dulles* and *Haig v. Agee* to resolve the question of whether the Department is acting outside of its authority in withholding a passport from Dana.

*Haig* held that the Secretary has the power to deny passports for reasons not specified in the Passport Act. *Haig v. Agee*, 453 U.S. 280, 290 (1981). *Haig* concerned the Department's revocation of a former employee of the CIA's passport engaging in activities. There, the Supreme Court examined historical practices to conclude that the Executive did have "authority to withhold passports on the basis of substantial reasons of national security and foreign policy," and that legislative history confirmed congressional recognition and of this power. *Id.* at 293. In *Kent v. Dulles*, the Supreme Court examined whether the Secretary of State had the authority to deny a passport based on suspicions that the passport applicant was a communist. Though the

16

Court concluded that the Secretary of State did not have authority to promulgate regulations denying passports to persons suspected of being communist, it also emphasized that the Department had a long history of exercising the power to deny passport applications based on grounds related to "citizenship or allegiance on the one hand or to criminal or unlawful conduct on the other." *Id.* at 127–28. Here, we don't have a case where the passport applicant is being denied on grounds related to national security, foreign policy, citizenship, allegiance, or criminal or unlawful conduct. Indeed, 22 C.F.R § 51.60 identifies a number of discretionary and mandatory reasons that a passport can be denied, and these provisions relate to such grounds. None of the provisions setting forth reasons for mandatory and discretionary restrictions of passports in 22 C.F.R. § 51.60 apply to Dana. ECF No. 61 at 23. "It is beyond dispute that the Secretary has the power to deny a passport for reasons not specified in the statutes," *Haig* at 281; however a reason must be given, and *Kent* and *Haig* both hold that it must also be a good one.

The authority to issue passports and prescribe rules for the issuance of passports under 22 U.S.C. § 211a does not include the authority to deny an applicant on grounds pertinent to basic identity, unrelated to any good cause as described in *Kent* and *Haig*. The Department contends that it was acting within its authority in requiring every applicant to fully complete the passport, *see* 2 C.F.R. §51.20(a). ECF No. 41 at 5. I agree, but Dana does not take issue with the regulation that requires fully completing a passport application. Dana's issue is that there is not an option on the passport application that does not require Dana to untruthfully claim to be either male or female. ECF No. 61 ¶ 26. I have already held that the Department has acted arbitrarily and capriciously in maintaining a gender policy that requires Dana to inaccurately select M or F, when the administrative record does not provide a rational basis for this requirement. Because neither the Passport Act nor any other law authorizes the denial of a passport application without

17

good reason, and adherence to a series of internal policies that do not contemplate the existence

of intersex people is not good reason, the Department has acted in excess of its statutory

jurisdiction.

### 3.  Injunctive Relief

In addition to declaratory judgment that defendant is in violation of the Administrative

Procedure Act, plaintiff's requested relief includes an injunction "permanently restrain[ing] or

enjoining Defendants from relying upon its male-or-female, binary-only gender maker policy to

withhold the requested passport from Dana or any other individual." ECF No. 1 at 21.  Because

Dana is the only plaintiff in this case, I will only evaluate this request for relief with regards to

Dana.

Section 706(1) of the Administrative Procedure Act directs a reviewing court to "compel

agency action unlawfully withheld or unreasonably delayed."  Section 706(2)(A) directs the

court to "hold unlawful and set aside agency action, findings, and conclusions found to be

arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law," and

section 706(2)(C) directs the court to do the same with those "in excess of statutory jurisdiction,

authority, or limitations, or short of statutory right."  This Court has already given the

Department an opportunity to shore up the record and show that its decision to deny Dana

Zzyym a passport was the result of rational decision making. For the reasons explained above,

the Department failed to do so.  Dana has been pursuing a passport for close to four years now.  I

grant Dana's request for injunctive relief and enjoin the Department from relying upon its

binary-only gender marker policy to withhold the requested passport from Dana.

**B.   Plaintiff's Claims for Mandamus Relief (Count V)**

The grant of a writ of mandamus under 28 U.S.C.A. § 1361 requires a showing that no

other adequate remedy is available.  *See Rios v. Ziglar*, 398 F. 3d 1201, 1206 (10th Cir. 2005);

*Mt. Emmons Mining co. v. Babbitt*, 117 F.3d 1167, 1170 (10th Cir. 1997).  Here, relief is

available under the APA, and the available remedy under both statutes is essentially identical.

*See, e.g., Mt. Emmons Min. Co.* 117 F. 3d at 1170; *Estate of Smith v. Heckler*, 747 F.2d 583, 591

(10th Cir. 1984) (citing *Carpet, Linoleum & Resilient Tile Layers, Local Union No. 419, Bhd. of

Painters & Allied Trades, AFL-CIO v. Brown*, 656 F.2d 564, 567 (10th Cir. 1981)) (" . . . 28

U.S.C. § 1331 gives the district court jurisdiction to issue a mandatory injunction.  The

injunctive remedy is provided for by the Administrative Procedure Act, 5 U.S.C. § 706(1), where

a court reviewing agency action is authorized to 'compel agency action unlawfully withheld.'

Thus, . . . we concluded that a mandatory injunction is essentially in the nature of mandamus,

and jurisdiction can be based on either 28 U.S.C. § 1361, §1331, or both.").

Ordering the defendant to issue the passport is, in substance, the same as enjoining the

defendant from relying on its binary gender policy to withhold a passport, since that is the only

basis on which the defendant has acted.  Technically, however, because injunctive relief is

available under the Administrative Procedure Act, and this relief is essentially identical to a writ

of mandamus, the Court need not issue a writ of mandamus.  Also, because the Administrative

Procedure Act grants plaintiff relief, I will not proceed to the constitutional claims in Counts III

and IV.

19

**CONCLUSION AND ORDER**

I find that the administrative record does not show that the decision making process that resulted in the policy in question was rational.  The withholding of the passport from Dana Zzyym is in excess of statutory authority.  Recognizing the unreasonable delays Dana has faced in the issuance of a passport with an intersex marker, the Court enjoins the Department from relying upon its binary-only gender marker policy to withhold the requested passport from Dana.

DATED this 19th day of September, 2018.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge

20

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-02362-RBJ

DANA ALIX ZZYYM,

     Plaintiff,

v.

MICHAEL R. POMPEO, in his official capacity as the Secretary of State; and
SHERMAN PORTELL, in his official capacity as the Director of the Colorado Passport
Agency for the United States Department of State,

     Defendants.

---

**FINAL JUDGMENT**

---

     In accordance with the orders filed during the pendency of this case, and
pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is hereby entered.

     Pursuant to the ORDER [ECF No. 88] of Judge R. Brooke Jackson entered on
September 19, 2018, it is

     ORDERED that the administrative record does not show that the decision making
process that resulted in the policy in question was rational.  It is

     FURTHER ORDERED that the withholding of Dana Zzyym's passport is in
excess of statutory authority.  It is

     FURTHER ORDERED that the defendants are enjoined from relying upon its
binary-only gender marker policy to withhold the requested passport from Dana Zzyym.

Dated at Denver, Colorado this 19th day of September, 2018.

FOR THE COURT:
JEFFREY P. COLWELL, CLERK

By:  s/  J. Dynes

J. Dynes
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 15-cv-02362-RBJ

DANA ALIX ZZYYM,

     Plaintiff,

v.

MICHAEL R. POMPEO, in his official capacity as the Secretary of State; and
STEVEN J. MULLEN, in his official capacity as the Director of the Colorado Passport Agency
for the United States Department of State,

     Defendants.

---

### ORDER ON MOTION TO STAY JUDGMENT

---

Final Judgment was entered in this case on September 19, 2018, ECF No. 89.  I held that the U.S. Department of State ("Department") violated the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) and (C) and enjoined the Department from relying upon its binary-only gender marker policy to withhold the requested passport from Plaintiff Dana Zzymm ("Dana"). Defendants filed a Notice of Appeal on November 19, 2018, ECF No. 93, and now move to stay this judgment pending appeal, ECF No. 98.  Plaintiff filed their response in opposition to this motion, ECF No. 101, and this motion became ripe with the filing of defendants' reply, ECF No. 105.  For the reasons set forth below, this motion is denied.

1

## I.     STANDARD OF REVIEW

District Courts have the authority to stay an injunction while an appeal is pending from the final judgment that granted the injunction.  Fed. R. Civ. P. 62(c).  However, "[a] stay is an intrusion into the ordinary process of administration of judicial review, and accordingly is not a matter of right, even if irreparable injury might otherwise result to the appellant."  *Nken v. Holder*, 556 U.S. 418, 427 (2009) (internal quotation marks and citations omitted).  It is within this Court's discretion to stay an injunction and the Department "bears the burden of showing that the circumstances justify an exercise of that discretion."  *Id.* at 434.

The Supreme Court has identified four factors that guide the issuance of a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *Id.* (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

The Tenth Circuit has held that "where the moving party has established that the three 'harm' factors tip decidedly in its favor, the 'probability of success' requirement is somewhat relaxed."  *F.T.C. v. Mainstream Mktg. Servs., Inc.*, 345 F.3d 850, 852 (10th Cir. 2003).  In these circumstances, the moving party need only to show that it "has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation."  *Id.* at 853.  However, as I will explain, I do not conclude that the defendants demonstrate that the harm factors weigh so decidedly in their favor to justify a relaxed review of the probability of success factor.  Therefore, the standard for factor

2

two is whether defendants show "a substantial likelihood of success on the merits of its appeal."
*Id.*

## II.   ANALYSIS

### A) **The Harm Factors.**

The Department argues that compliance with the Court's injunction during pendency of
the appeal would irreparably harm defendants and the public.  Where, as here, the government's
"asserted injury is exclusively one involving the public interest," the second and fourth prongs of
the stay analysis overlap.  *Mainstream Mktg. Servs., Inc.*, 345 F.3d at 852.  As support, the
defendants provide the declarations of Carl C. Risch, Assistant Secretary of State for Consular
Affairs, ECF No. 98-1, and Kenneth J. Reynolds, Director of the Office of Consular Systems and
Technology, ECF No. 98-2.  In his declaration, Mr. Reynolds discusses the process of producing
a valid U.S. electronic passport.  An electronic passport or "ePassport" is the standard U.S.
passport issued by the Department and contains an electronic chip containing secure digitized
image and biographic data about the bearer.  ECF No. 98-2 at ¶3.  Mr. Reynolds describes the
numerous information technology systems involved in producing ePassports that would need to
be modified to ensure that an additional sex marker would be recognized and supported.  He
estimates that the changes to existing software systems to create a fully integrated ePassport
would take approximately 24 months and cost $11 million.  *Id.* at ¶1.

Mr. Reynolds also states that the Bureau of Consular Affairs ("CA") has considered the
possibility of printing a single ePassport for Dana with an "X" sex marker as a "one-off," outside
of the normal processes.  *Id.* at ¶7.  Instead of updating all software systems to create a fully
integrated ePassport, he can incorporate modifications to certain systems to change the sex

3

marker in the issuing system's database to an "X."  Producing a one-off passport would take approximately four weeks.  *Id.* at ¶7.  Mr. Reynolds describes some drawbacks to the one-off passport: mismatches with Department of Homeland Security (DHS) systems could lead DHS officials at ports of entry to require additional screening for Dana,  *id.* at ¶9, and a one-off passport would take longer to replace if lost or stolen, *id.* at ¶10.  Mr. Reynolds describes another option as well: producing a type of passport known as an Emergency Photo-Digitized Passport (EPDP).  *Id.* at 17.  Unlike an ePassport, an EDPD does not have an electronic chip.  It can only be printed at overseas posts, and would need to be renewed more frequently than an ePassport, typically every year.  *Id.* at ¶16.  This type of passport would also take approximately four weeks to produce.  *Id.* at ¶18.  Issuing a one-off EDPD passport has the same drawbacks as the ePassport: delays in re-issuance if lost or stolen and not matching data in the record systems potentially causing Dana additional screening.  *Id.* at ¶¶18-20.

Mr. Risch, in his declaration, describes harms that he perceives the issuance of a one-off passport for Dana would cause.  He states that the issuance of a single passport that does not conform to publicized U.S. standards would undermine the U.S. passport's status as the "gold standard" identity and travel document.  ECF No. 98-1 at 7.  He states that because the Department has not announced any intention to produce passports with anything other than "F" or "M" as sex markers, that the bearer of the one-off passport, Dana, would be subjected to additional vetting, inconvenience, delay, and possible denial of entry.  *Id.*  He further states that the issuance of a one-off passport to Dana could make foreign officials more likely to accept similarly nonconforming passports issued by other countries in the future, undermining the reliability of the system of international travel.  ECF No. 98-2 at 5.

The Department argues the time and cost required to fully integrate changes to their system is irreparable injury.  It argues further that pursuing an option that does not require investment in their software systems and takes four weeks, producing a "one-off" passport for Dana, would cause irreparable harm to "the U.S. passport's status as the gold standard identity and travel document."  ECF No. 98 at 9-10.

Plaintiff argues that if the Department chooses to pursue the first option of updating their software systems, economic loss does not, in and of itself, constitute irreparable harm.  *See Port City Props. V. Union Pac. R.R. Co.*, 518 F.3d 1186, 1190 (10th Cir. 2008).  Citing law from other circuits, plaintiff argues that "[t]o successfully shoehorn potential economic loss into a showing of irreparable harm, a [movant] must establish that the economic harm is so severe as to 'cause extreme hardship to the business' or threaten its very existence."  *Coal for Common Sense in Gov't Procurement v. United* States, 576 F. Supp. 2d 162, 168 (D.D.C. 2008).  Defendants point out that these cases refer to businesses, and not federal agencies.  However, the reasoning in these cases is applicable to any entity.  That is, that economic loss is not irreparable harm unless the movant can show that such an economic loss would cause it harm as an entity, for example by impairing its ability to perform its core functions.

Plaintiff asserts that an $11 million expense would not amount to irreparable harm as that cost represents only .03 percent of DOS's annual budget.  The Department points out that plaintiff identifies no authority for comparing the cost of implementing the "X" sex marker to the entire DOS budget.  Instead, the Department offers that the estimated cost of implementing the "X" marker changes would be 4.7 percent of the budget allocated to CA, Office of Consular Systems and Technology for systems development, operations and maintenance relating to the

Passport function for FY2019.  ECF No. 105 at 2.  It is the Department's burden to show that it would suffer an irreparable injury.  The Department does not argue that an expenditure that amounts to 4.7 percent of the budget allocated to consular systems and technology for systems development, operations and maintenance for this year would impair its ability to perform these technological tasks related to the Passport function.  Because the Tenth Circuit has held that economic loss by itself is not irreparable harm, I cannot conclude that updating its software systems would cause irreparable harm to the Department.

In reference to the one-off passport solution, plaintiff also argues that the Department cannot claim potential harm to Dana, such as travel delays, as irreparable harm to itself.  Given that there are possible reasonable solutions to these issues, such as giving notice to passport officials, and that U.S. customs and border officials already encounter "X" passports of foreign nationals entering the United States, plaintiff suggests that the difficulty of processing this "X" passport may be overstated.  ECF No. 101 at 4-6.  I also note that Dana now has a Colorado driver license bearing gender marker of "X," undercutting some of the Department's "matching" concerns, and that Dana plans to use this passport to travel to a conference in New Zealand, a country that issues and accepts passports with a gender designation of "X".[1]

Plaintiff also argues that the Department's arguments that a one-off passport would impair national security are speculative.  *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862 ("National-security concerns must not become a talisman used to ward off inconvenient claims.").  Much of the defendants' brief discusses how harm to the U.S. passport's reputation can harm national

---

[1] *See Information about Changing Sex/ Gender Identity*, Government of New Zealand Identity and Passports https://www.passports.govt.nz/what-you-need-to-renew-or-apply-for-a-passport/information/ (Last Accessed Feb. 20, 2019).

security interests, and I find this to be a reasonable and almost self-evident argument.  However, the Department's argument that the U.S. passport's reputation will be harmed in the first instance is premised on the fact that the U.S. passport is backed by a "robust set of *publicized* [Department of State] regulations and policies" and that the Department undertakes "substantial effort to notify all countries about [an] impending change and send exemplars of the document so that foreign authorities can recognize the valid document."  ECF No. 98 at 9.  I don't see why the Department cannot issue appropriate notice or publicize its issuance of Dana's passport in the same way to address concerns that the U.S. Passport's reputation will be harmed if a passport does not conform to information that the Department publicizes about U.S. passports.  Yet, the Department asks that I do not substitute my views for the conclusion of a senior Department official, ECF No. 105 at 3, and I do not intend to do so.  If the Department concludes that issuing a single passport to Dana even with appropriate notice will undermine the system of international travel as we know it, ECF No. 98 at 10, it can comply with the judgment by updating its software systems.  While this may be a difficult choice for the Department, it is not an impossible choice.  Complying with a judgment necessarily involves some harm to the party against whom a judgment is entered.  Yet, the issuance of a stay is "an extraordinary remedy," *Nken,* 556 U.S. at 437 (J. Kennedy concurring), and the Department has not demonstrated irreparable harm to justify it.

       To the third harm factor, the Department argues that a stay would not affect plaintiff, as the Department can issue Dana a passport with an "F" or "M" marker.  However, the Department has made this offer throughout the course of this case's litigation, arguing at times that Dana's ability to obtain such a passport should render Dana's case meritless.  I have addressed this

argument in past orders, and will not do so again here, finding that a stay will cause harm to

Dana.  *See* ECF Nos. 55, 88.  Dana has missed travel opportunities for four years throughout the

course of this litigation, and Dana would continue to miss travel opportunities if a stay is granted.

    **B)** **Likelihood of Success on the Merits of the Appeal.**

Defendants must also demonstrate a substantial likelihood of success on the merits of an

appeal to justify the issuance of the stay.  Defendants raise some arguments regarding the

Department's 2017 decision to deny Dana's passport application that they argue they did not

have an opportunity to brief prior to this Court's judgment.  After reviewing the briefings, I

respectfully conclude that this factor also does not weigh in the defendants' favor.

**ORDER**

Defendants' Motion to Stay, ECF No. 98 is DENIED.

DATED this 21st day of February, 2019.

                         BY THE COURT:

                         _____

                         R. Brooke Jackson
                         United States District Judge

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,841 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Lewis S. Yelin*
Counsel for Appellants-Defendants

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that (1) all required privacy redactions have been made; (2) any paper copies of this document submitted to the Court are exact copies of the version filed electronically; and (3) the electronic submission was scanned for viruses and found to be virus-free.

*s/ Lewis S. Yelin*
Counsel for Appellants-Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on March 5, 2019, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system

*s/ Lewis S. Yelin*
Counsel for Appellants-Defendants